EVERETT, Respondent, *v.* HINES, Director-General of Railroads, Appellant.

(No. 4,833.)

(Submitted June 3, 1922. Decided July 11, 1922.)

[208 Pac. 1063.]

*Personal Injuries—Railroads—Street Crossing Accident—Contributory Negligence—Jury Question—Excessive Verdict—New Trial.*

Personal Injuries — Railroads — Street Crossing Accident — Contributory Negligence—Jury Question.
1. Where plaintiff, in an action for injuries sustained at a street crossing by collision of his automobile with a locomotive, had taken

---

1. Automobile accidents at railroad crossings, see notes in Ann. Cas. 1913B, 680; Ann. Cas. 1915B, 767; Ann. Cas. 1916B, 166.

Care required of driver of automobile at railroad crossing, see notes in 21 L. R. A. (n. s.) 794; 29 L. R. A. (n. s.) 924; 46 L. R. A. (n. s.) 702.

[64 Mont. 244.]

all precaution reasonably required of him, by first stopping his car to permit a freight train to pass, and then, proceeding cautiously, looking and listening, his view being obstructed by a string of cars on another track, was struck by a switch engine which was running at a rate of about fifteen miles per hour without giving warning of its approach, the question whether he was guilty of contributory negligence *held* one for the jury's determination.

Same—Excessive Verdict—New Trial.

2. *Held*, that a verdict for $8,000 for the destruction of a Ford automobile and personal injuries not of a serious nature was so excessive that it could be accounted for only on the theory of passion and prejudice of the jury against defendant railway company, requiring a new trial. (MR. JUSTICE COOPER dissenting.)

*Appeals from District Court, Rosebud County; Geo. P. Jones, Judge.*

ACTION by Jack G. Everett against Walker D. Hines, Director-General of Railroads. From an adverse judgment and an order denying a motion for new trial, defendant appeals. Reversed and remanded.

*Messrs. Gunn, Rasch & Hall,* for Appellant, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

We submit that the plaintiff was guilty of contributory negligence, as a matter of law, and that on that ground the judgment should be reversed and the action dismissed. (Citing in addition to Montana cases referred to and distinguished in the opinion: *Rule* v. *Atchison, T. & S. F. Ry. Co.,* 107 Kan. 479, 192 Pac. 729; *Gersman* v. *Atchison, T. & S. F. Ry. Co.* (Mo.), 229 S. W. 167; *Rayhill* v. *Southern Pac. Co.,* 35 Cal. App. 231, 169 Pac. 718; *Benedict* v. *Hines,* 110 Wash. 338, 188 Pac. 512; *Chicago, Great Western Ry. Co.* v. *Biwer,* 266 Fed. 965; *Gasser* v. *Philadelphia & R. Ry. Co.,* 266 Pa. St. 493, 109 Atl. 760; *Marty* v. *Chicago etc. Ry. Co.,* 38 Minn. 108, 35 N. W. 670; *Zaun* v. *Long Island R. Co.,* 139 App. Div. 719, 124 N. Y. Supp. 511; *Holland* v. *Chicago etc. R. Co.,* 18 Fed. 243, 5 McCrary, 549; *Central R. Co. of New Jersey* v. *Smalley,* 61 N. J. L. 277, 39 Atl. 695; *Keller* v. *Erie R. Co.,* 183 N. Y. 67, 75 N. E. 965; *Bancroft* v. *Boston etc. R. R. Corp.,* 97 Mass. 275.)

*Mr. F. F. Haynes,* for Respondent, submitted a brief and argued the cause orally.

The plaintiff had an absolute right, and without in any sense being negligent, to proceed after he had carefully surveyed the situation in front of him. He had a right to proceed cautiously, listening and looking and with his car under control. He did this exact thing. He had a right to assume that there would be no engine speeding behind this barrier without the plaintiff receiving some warning. (*Pittsburgh L. etc. R. Co.* v. *Terrell,* 177 Ind. 447, 42 L. R. A. (n. s.) 367, 95 N. E. 1109; *Williams* v. *Chicago, B. & Q. R. Co.,* 78 Neb. 695, 14 L. R. A. (n. s.) 1224, 111 N. W. 596; *Gesas* v. *Oregon Short Line Ry. Co.,* 33 Utah, 156, 13 L. R. A. (n. s.) 1074, 93 Pac. 274; *Mason* v. *Northern Pac. Ry. Co.,* 45 Mont. 474, 124 Pac. 271. See, also, the following cases: *Bilton* v. *Southern Pac. Ry. Co.,* 148 Cal. 449, 83 Pac. 443; *Cherry* v. *Louisiana & A. R. R. Co.,* 121 La. 471, 126 Am. St. Rep. 323, 17 L. R. A. (n. s.) 505, 46 South. 596; *Eichorn* v. *New Orleans etc. Power Co.,* 112 La. 236, 104 Am. St. Rep. 437, 36 South. 335.)

In *Barnum* v. *Grand Trunk Western Ry. Co.,* 148 Mich. 370, 111 N. W. 1036, the court held that where it appeared that an engine was backed over a street crossing, it was proper for the trial court to leave to the jury the elements of obstruction of view, the absence of a flagman or gates, the passing of a freight train immediately before the backing of the engine and the absence of a lookout on the engine. The amount of travel is a material element in considering the question of danger at a crossing. (*Union Pac. Ry. Co.* v. *Connolly,* 77 Neb. 254, 109 N. W. 368.) This court has well defined the duties of a traveler by automobile at a railroad crossing: "The driver of an automobile approaching a railway crossing was not negligent as a matter of law in looking and listening for approaching trains without stopping; it being question for the jury whether, under the circumstances, ordinary prudence required him to stop." (*Walters* v. *Chicago, M. & P. S. Ry. Co.,* 47 Mont. 501, 46 L. R. A. (n. s.) 702, 133 Pac. 357; *Louis-*

*ville etc. R. R. Co.* v. *Schuester,* 183 Ky. 504, 4 A. L. R. 1344, 209 S. W. 542.)

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action brought to recover $10,000 damages alleged on account of personal injuries sustained by the plaintiff, and injury to a Ford automobile belonging to and being driven by the plaintiff, by reason of having been struck on a railroad crossing in the town of Forsyth on the evening of September 13, 1919, by a switch engine operated by the defendant. Upon issues being joined, the case was tried to a jury and a verdict rendered in favor of the plaintiff for the sum of $8,000, upon which judgment was made and entered. The appeal is from the judgment and an order denying defendant's motion for a new trial.

Though several errors are assigned, in our opinion but two questions are involved necessary for consideration determinative of the case, *viz.*: (1) Was the plaintiff guilty of such contributory negligence as to defeat his right of recovery? and (2) Were the damages awarded so excessive as to indicate passion and prejudice?

1. It appears that about 6:30 P. M. September 13, 1919, in the town of Forsyth, the plaintiff was driving a Ford touring car south along Tenth Avenue, and when crossing the railroad tracks of the Northern Pacific Railroad Company where they traverse such street he collided with a switch engine operated by the defendant, resulting in demolishing the automobile and serious injury to the plaintiff. At the time of the accident Hugh Daugherty was riding with the plaintiff, seated alongside of the plaintiff in the front seat. The railroad tracks cross Tenth Avenue from east to west and from the point of intersection the street runs north and south. There are three principal railroad tracks, and from the north to the south they are: The main line, being the first track; track No. 1, being the second track; and track No. 2, being the third track. The following diagram will illustrate the situation on the

ground, and possibly lead to a better understanding of the facts:

As plaintiff approached this crossing, it was blocked by a freight train which was slowly moving west over the main line, and after it had passed, his view of track No. 2 to the west was shut off by reason of a long string of freight-cars stand-ing on that track, the last of which, being the east end thereof, was a large gondola car which extended into the middle of the street on the crossing. The next car to it, west, was a large furniture or automobile car, and thence along that track freight-cars extended in unbroken line in a considerable num-ber. When the plaintiff stopped to permit the moving freight

[64 Mont. 244.]

train to pass, he kept the motor of his car going and remained stationary at the approach of the main track for about five minutes, the time required for this train to clear the crossing. He then proceeded cautiously, running his machine in low gear at the rate of about four miles per hour. He looked and listened, and wondered if possibly the freight train on track No. 2 so extending into the street would move, and having satisfied himself that it was at a dead stop, not attached to a locomotive, and not likely to move, he proceeded slowly and cautiously over track No. 1 around the east end of the gondola car, being required to turn to the left or east from the center of the street on such crossing in order to go around the end of the gondola car. The distance from the main track to track No. 1, is eleven feet two inches, and from track No. 1 to track No. 2 is eleven feet. He was unable to see an approaching switch engine on track No. 2, coming from the west at a rate of about fifteen miles per hour, in consequence of the freight-cars standing on track No. 1, until after he had crossed track No. 1, to the rear of the gondola car, but too late to avert a collision. He swerved the Ford car driven by him to the east along the track, so that the impact would be to the rear of the Ford, instead of the side thereof, and the next few seconds the Ford was completely demolished, and both Daugherty and the plaintiff thrown forcibly to and upon the ground.

The evidence discloses that the plaintiff was rendered unconscious in consequence of the accident and remained in a semi-comatose state from Saturday, the day of the accident, until the following Tuesday. The age of the plaintiff is not shown, but it appears that he is a married man, having a family consisting of his wife and two children, then residing with him. He had lived in Forsyth for about eleven years and was engaged in the automobile and garage business. He was thoroughly familiar with the grade crossing on which the accident occurred, and says that he had used the crossing a good many hundred times prior to the accident. In describing his physical condition prior and subsequent to the accident, he

testified in his own behalf on direct examination, in part as-
follows: "My condition prior to this time that I was struck—
I was in good health, and had been in good health all my life.
The only sickness .I had or disability in any way was the 'flu'
in 1918, and I had fully recovered from that. I felt normal
and well in every respect. Prior to the time of this collision
I had never been in any accident before of such a nature that
injured me physically. The condition of my eyes and vision
prior to the time I was struck was good. At the end of the
month when I was getting out my statements my eyes used
to get tired, and I went to Dr. Sawtelle and got some glasses
to relieve that strain, but no trouble. I didn't wear them only
at the end of the month when I was getting out my state-
ments. Prior to the collision I did not have a chronic ailment
of any nature whatever. The condition of my sense of smell
prior to the evening I was struck by the locomotive was good.
It was normal, and my sense of taste was all right in every
way. Prior to that time I never had had any trouble with
my back. * * * Q. Now state to the jury what condition
you was in on the day that you regained your sense of per-
ception, being Tuesday, I believe, the 16th of September.
A. 1 had a terrible headache, is the first sense I had, and my
eyes hurt. I couldn't open them, because the light hurt them,
and they bathed my eyes with hot water and then cold, and
when I got out I had to wear glasses, and all these days
I had a terrific headache and eyes ached, and I was bruised
all over in every way, and my back hurt. I was at home at
this time, and my wife and children were with me. It was
about a week before I was again out, that is, before I had
sufficiently recovered so as to be out, and I then came down
town. My headaches were so bad, and eyes—the weather was
warm and I stayed on the porch or lounge, and my head and
eyes kept throbbing so I decided I had a fracture or pressure,
and, although I didn't feel like it, I decided I would go to
Miles City and have an X-ray picture taken to determine
what was the trouble. I thought I might have a break in my
skull or something, so I went to Miles City. I had a car

[64 Mont. 244.]
come up from the garage, and I went to Miles City. Since that time, up to the present time, my eyes have been weak so that I have been unable to do any amount of work for any definite length of time without them giving me pain, and whenever they do that I quit, and wait until they rest up and then do a little more. Oftentimes, we get carload lots of tractors and implements, and it is a part of my work to see that the cars are unloaded properly, and I have always been able to get out and wrestle my end of the cars.  *  *  *  I have not been able to do that any more. And at times I have headaches. They are a kind of throbbing ache, stays with you for quite a while, and my eyes throb. It isn't all the time; it just comes on.  *  *  *  '' He further testified that since the accident he has not much energy, and cannot perform the work that he did before, and that he is worried greatly over his physical condition and suffered not only physical pain, but mental as well.

Special damages pleaded, and for which recovery was sought by plaintiff—*i. e.*, the sum of $600, the value of the Ford automobile, $100, the reasonable value of medical service, medicines, and nursing, and the sum of $500 for loss of plaintiff's time in connection with his business operations—are amply sustained by the proof. Other damages alleged and claimed are general in character, based upon his injuries, physical pain, mental suffering, and the extent and duration thereof.

Dr. W. A. Alexander, who gave first-aid treatment to the plaintiff at the time of the accident, testified (concerning plaintiff's injuries) on direct examination in part: ''I was driving by in my car at the time coming north on Tenth Avenue from the south side up Tenth Avenue to the grade crossing. I did not see the accident there that evening. When I arrived there I found Jack lying there, and I went up and shook him a little bit, and he rallied then, and we got him up and got one man on each side of him and helped him into my car. The cabooses were across the track then, and I couldn't get by, and when they pulled out I took him to my office and treated him. I had occasion to examine Mr. Everett

at that time, which was the evening of September 13, 1919, immediately after the accident. I found Mr. Everett badly shocked, concussion—in shock. When I got him to the office he was still in a semi-comatose condition, in shock, from the concussion. From the examination I made of him, I knew he had been injured recently, but I couldn't tell the extent. He had a cut on his head on the left parietal bone. It was a wound about two inches long, lacerated wound. I had occasion to examine Mr. Everett after that no more. He was in my office possibly twenty minutes to half an hour, and that was the last time I saw him as a physician, or attended him. At the time he left my office, he was practically conscious. He didn't fully realize what he was doing. * * * Q. Were you able to determine from your examination of Mr. Everett at that time whether or not he was undergoing any physical suffering or pain? A. I was. Q. Was he doing so when you last saw him? A. He was.''

On cross-examination the witness testified: ''Q. What time of the evening was it that you saw the scene of the accident? A. I should judge about a quarter of 7 in the evening when I saw him. I just came from dinner over at Mrs. Meadors. * * * Q. Did you make a digital examination of the bones of the head? A. Yes. Particularly with reference to the left parietal bone where the cut was. Q. Will you indicate for the benefit of the jury where the cut was. About the approximate location of the wound you found? A. It was about there [indicating]. Q. You are now indicating a point approximately three inches above and one inch forward of the ear? A. Yes. Q. Possibly two inches in length? A. Yes. Q. You didn't find any indication of fracture? A. No, sir. Q. Did you attempt to palpate the bones in that particular vicinity? A. Yes, sir. Q. And you got no movement? And no crepitus? A. No, sir. Q. Then to the best of your examination there was no fracture? A. Not to the best of my knowledge. Q. And as a matter of fact he was just in the ordinary condition that a man would be who was knocked out? A I just give him first-aid treatment. Q. When you say he

[64 Mont. 244.]
was in a semi-comatose condition— A. In shock, stupor. Q. And partially conscious? A. Partially, in stupor; yes."

Dr. A. C. Wilson, who attended the plaintiff during his illness after the first-aid treatment administered by Dr. Alexander, testified in part on direct examination as a witness on behalf of the plaintiff as follows: "Q. Did you have occasion to attend professionally Mr. Everett immediately after the collision over on the Northern Pacific Railway last summer, in September? A. Not immediately. Some little time after. I couldn't tell exactly how long after, but probably an hour and a half or two hours probably. I saw him at his home, up on the Flat, or the first house on the Flat, on the right-hand side of the road. It is about two miles, maybe a little less, from the place of the accident up to his home where I saw him. I examined Mr. Everett at that time and place. I found his condition, he was practically unconscious, practically so, and, on examination of his wounds, I found a wound about an inch and a half long, probably, on the left-hand side of the median line of the vertex of the head, and there was also a contusion on the right-hand side, but no separation of the surface. On the back of his head there was a lump over the back of his head and a few scars over the right part of the face, and there was contusions over that, and his right elbow. On the outside of the right knee of the right leg, and he was all dirty, of course, from coal, and black-looking, as we generally find them when injured on the track. I examined his back also. It bore the appearance of being some contusion over there, scraped a little, but there was no visible separation of the tissues—that is, we could call it kind of bruised, just a little bit below the shoulders. Q. And with respect to the spinal column where was that injury located? A. A little bit below the shoulders in the dorsal region, a little bit to one side of it, and a little below the shoulders. Q. Now, Doctor, I will ask you to describe the patient's condition, apparent condition, from your examination, respecting any, if there was any, nervous disorganization, at this time? A. Of course he presented all the appearances of a person knocked out, stunned, contusions on

the head. They all have that. Q. Did he seem to be rational and in possession of his faculties? A. No; he was not. Q. This examination about which you have testified, you say was about an hour and a half after the accident? A. Yes. Somewhere along that. I wouldn't exactly say how long. Q. When did you next see Everett? A. I saw him twice that night. I wanted to give him a little hypo, and I had been using the hypo on another patient, and I had left it out of my case. I just grabbed the case when I went up there, and I had to give him something, and I came back to town for it, and I saw him again after I came back, and the next day I came back again. Q. Was there any physical or apparent indication on your examination of the patient of suffering? A. Yes; he was moaning and groaning, both in the first and second examination, and in a semi-comatose condition. I examined him twice the next day. The first time I was there somewhere around 10 or 11 o'clock. There wasn't much improvement in his condition at that time from the condition he was in when I last saw him, although there was some little. I saw him again that day in the afternoon. That was Sunday."

Dr. Wendell Cotton, a witness on behalf of the plaintiff, testified that the plaintiff called upon him for examination and treatment at his office in Forsyth about the twenty-third day of September, 1919. His testimony given concerning his examination made of the plaintiff respecting the injuries by him sustained is covered by the following: "Well, at that time he still showed scars on his scalp. There were two on the left side of the head, one about two inches below the median line above the left ear, and I think about two inches in length. The other one was about an inch above this running diagonally over toward the center; a scar on the right side of the protuberance of the parietal bone. He showed considerable weakness and pain on bending his back, in stooping over, and in various other positions and tests we put him through. He showed considerable bulging of the left eardrum. His hearing was considerably diminished on that side, so that my watch could be heard only at a distance of six inches, whereas on

[64 Mont. 244.]
the right ear it was apparently normal, the hearing. The left eye was a little weaker than the right eye. I tested his sense of smelling, so far as we are able to by various odoriferous substances, and the sense of taste, I found the sense of smell was, I concluded, was totally lost, and, due to subsequent examinations, have concluded that it is permanently lost. * *. * The sense of taste is evidently impaired through the loss of the sense of smell, the two being very intimately associated. The two senses are very closely related, and where the sense of smell is abolished, the sense of taste is necessarily considered affected secondarily. Volatile substances, such as coffee, or most foods, give off certain volatile substances which pass through the posterior part of the nose, where the sense of smell is located, and in eating substances these volatile substances pass up the back of the nose to the location of the olfactory organs, and, if it is impaired, the taste is also impaired secondarily. The olfactory organ is located in the upper part of the nasal fosse, there being one on each side of the nose. It consists of a highly sensitive tissue of microscopic cells supported by a sort of connecting tissue. These cells have very minute microscopic hairs on the end of them, upon which they preserve or pick up the irritation which produces an odor. The air of odor must be in motion in order for it to be preserved as a smell, as in sniffing. If there is an odor present, there is an irritation set up, which is conducted by very minute cells through the axioms(?) or prolongations to the olfactory bulb at the base of the brain, and through the olfactory tract to the base of the brain. I examined the back of the plaintiff at that examination. There was at that time a condition of acute sensitiveness. He was very sensitive to feeling or pressure over part of the back. This was located just above the small of the back. In bending in different directions he was unable to do so without considerable pain. He couldn't double over very well without flinching, and it was my diagnosis that there was strain.''

The plaintiff bases his right of recovery upon the defendant's negligence in operating the switch engine within the

corporate limits of Forsyth at a high rate of speed across a regularly established grade crossing; failure to whistle or ring a bell or give other warning of the approach of the engine; negligently permitting its freight-cars to stand upon the crossing obstructing his vision and hearing; and in having failed to provide a flagman or switchman at the crossing to give warning to those using the same of danger.

It appears that a flagman or switchman was provided at the time by the defendant at this crossing, but he did not see the plaintiff until the latter was on track No. 1, too late to avoid the collision. The switch engine was running at about fifteen miles per hour, and the whistle was not sounded. There is no dispute with reference to the partial obstruction of the street on track No. 1 by the gondola freight-car.

The line of demarcation between contributory negligence as [1]    a matter of law and of fact is not always readily to be determined (*Neilson* v. *Missoula Creamery Co.*, 59 Mont. 270, 196 Pac. 357), but the case under consideration involves no difficulty in classification. The plaintiff took all precaution reasonably to be required of him, and the accident would not have occurred had the defendant not negligently caused an obstruction of the street and of his view by leaving a string of freight-cars on track No. 1. In the case of *Sprague* v. *Northern Pac. Ry. Co.*, 40 Mont. 481, 107 Pac. 412, view of the railroad crossing was obstructed by a growth of brush and trees. The plaintiff's agents were driving along the highway in a buggy, and leading two horses belonging to plaintiff, they not being able to see the railroad track until near the crossing, but ten feet from the track; at a point distant from 100 to 300 feet the driver had stopped and listened, and then drove on to the crossing, continuing in vigilance for approaching trains. As a result of collision with a train the horses being so led were killed. It was held that whether the plaintiff's agents were, under the circumstances, guilty of such contributory negligence as to defeat recovery was a question of fact for the jury.

[64 Mont. 244.]

In the case of *Sherris* v. *Northern Pac. Ry. Co.*, 55 Mont. 189, 175 Pac. 269, a collision occurred after dark between an automobile driven by one Black, in which the plaintiff was riding as a guest, and one of defendant's trains, on a street railroad crossing in the city of Missoula. The main line of the railroad extended east and west, and consisted of two tracks, designated respectively as the east-bound main track and the west-bound main track. In approaching the east-bound main track one driving along the street was required to cross seven other tracks besides the west-bound main track. One passing over the first two tracks could not readily see the movement of cars or engines in the yards toward the west, because of a high platform used for icing cars, which extended to the west several hundred feet. However, after passing over the third track, the view of the east-bound main track was open several hundred feet to the west. The view to the west was wholly unobstructed, except for one of two cabooses standing on one of the tracks. There was an arc-light suspended over the tracks on the street, and the yard was dark except for objects made visible by this light. The plaintiff in that case testified "that he sat in the front seat of the automobile by the side of Black; that Black drove into the yards at the rate of six or eight miles an hour; that the wheels of the automobile were not provided with chains; that, when it reached track 6, Black shut off the power and allowed the automobile to drift along in high gear; that it was making no noise; that, as they approached the main line, both he and Black kept a constant lookout, glancing to the right and left; that he could not see a train approaching from the west until he had passed the caboose track; that he heard no noise of any kind; that as they passed this track he glanced to the right, then to the left, and again to the right; that Black did the same; that as he glanced to the right the second time he discovered the train coming from the west on the east-bound main track; that it was made up of several cars, two of which were being pushed by an engine; that there was no person on the front of the foremost car, nor any light; that

the bell of the engine was not rung, nor the whistle sounded; that the train was approaching at a rate of about twice as fast as Black was driving, and that, when he saw the train, Black was looking to the left; that he called to Black, who at once put on the brake to stop, but that the automobile skidded along until it came so near the east-bound track that it was struck by the step of the front car and pushed around until it faced to the east, with the result that plaintiff, in the act of jumping to save himself, was thrown to the ground and injured." The question of contributory negligence was held properly to be one for the jury.

If the evidence showed lack of proper precautions exercised by the plaintiff, under former holdings of this court, there would be no escape from denying to the plaintiff the right of recovery, as a matter of law, because of his contributory negligence; but here the evidence is such that the question was one proper for determination by the jury.

This case is clearly distinguishable from *Hunter* v. *Montana Cent. Ry. Co.,* 22 Mont. 525, 57 Pac. 140; *George* v. *Northern Pac. Ry. Co.,* 59 Mont. 162, 196 Pac. 869, and *Keith* v. *Great Northern Ry. Co.,* 60 Mont. 505, 199 Pac. 718. In *Hunter* v. *Montana Cent. Ry. Co.* the obstruction of view of the grade crossing consisted of willows growing along the railroad track. Plaintiff's decedent, with companions, was crossing the track in a surrey pulled by a team of horses, on a dark night; the crossing was known to them; they neither stopped, looked nor listened, and on discovery of the approaching train, at a distance of about forty-five feet from the track, they attempted to clear the crossing ahead of the train, resulting in the death of the decedent. Plaintiffs were properly denied recovery, because of contributory negligence.

In the case of *George* v. *Northern Pac. Ry. Co.* the district court granted a nonsuit and entered judgment for the defendant, which was by this court affirmed. There it appeared that on Main Street, in Miles City, which runs north and south, the defendant company's tracks crossed the street in an easterly and westerly direction. The railroad tracks were four in

[64 Mont. 244.]
number, seven or eight feet apart, and were on a level with the street. These tracks were designated in order from north to south as tracks 1, 2, 3 and 4. On the west side of the street and abutting track 1 was an elevator building. On the east, in relatively the same position, were buildings used by the owner in conducting a lumber business. To one approaching the railroad crossing from the north, his view would therefore be obstructed both toward the east and west. There were no buildings along track 4, either to the east or west, so that one approaching from the south had a clear view of the several tracks, except as the same might from time to time have been obstructed by cars left thereon. One of the plaintiffs driving the automobile in question approached the crossing from the south, and, finding a freight train passing over track 3 toward the west, stopped five or six feet from track 4 to wait for the train to pass, meanwhile keeping his motor going. When the rear end of the caboose had reached the west line of the street, he proceeded, and as he was about to cross track 2 his automobile was struck by a second freight train traveling east. In affirming the judgment of the trial court, Mr. Chief Justice Brantly, speaking for this court, restated the rule announced in the case of *Sherris* v. *Northern Pac. Ry. Co.*, as follows: "In this jurisdiction it is the rule that contributory negligence is a matter of defense to be established by preponderance of the evidence. The plaintiff has made out a *prima facie* case when his evidence discloses injury to himself and that the negligence of the defendant was the proximate cause of it. (*Nelson* v. *City of Helena,* 16 Mont. 21, 39 Pac. 905; *Hunter* v. *Montana C. Ry. Co.,* 22 Mont. 525, 57 Pac. 140; *Monson* v. *La France Copper Co.,* 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243; *Therriault* v. *England,* 43 Mont. 376, 116 Pac. 581; *Howard* v. *Flathead Ind. Tel. Co.,* 49 Mont. 197, 141 Pac. 153.)    *    *    *    'Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. When, therefore, a plaintiff asserts the right of recovery on the ground of culpable negligence of the defendant, he is bound to show that

[64 Mont. 244.]

he exercised his intelligence to discover and avoid the danger, which he alleges was brought about by the negligence of the defendant.' This statement of the rule requires the person approaching a railway crossing to take all reasonable precaution to assure himself by actual observation that there is no danger from an approaching train. The failure of the persons in charge of the train to keep a lookout and to give warning signals of its approach to the crossing does not relieve the traveler from the necessity of making a vigilant use of his senses to ascertain whether it is safe to proceed. [Citing cases.] It is not always sufficient if he does look and listen. The obligation resting upon him is to exercise care to make the act of looking and listening reasonably effective. (*Sprague* v. *Northern Pac. Ry. Co.*, 40 Mont. 481, 107 Pac. 412.) If he goes upon the crossing without taking this precaution, he is guilty of contributory negligence, and, if injured, cannot recover.''

In the case of *Keith* v. *Great Northern Ry. Co.* it appeared that a Ford automobile driven by the plaintiff, Keith, was struck by a train operated by the defendant at its crossing on Oak Street, in the city of Helena. Oak Street runs in a northerly and southerly direction, and as the plaintiff approached the crossing from the north he was driving at a rate of speed in excess of eight miles per hour. His view of the railroad tracks was unobstructed until he reached approximately the northerly line of the railroad right of way. The plaintiff, according to his testimony, was twenty-six feet from the north rail of the railroad track when he first saw the train approaching. ''His statement of his actions from the time he saw the train was as follows: 'When I came in sight of the road [railroad] I saw the train coming, and I shut off, and I thought I would easily stop before I got in front of the train, at the speed it was going. I shut her right off. The front wheel went across the track. It is planked for only one rig, one team, or whatever it might be to cross, and when she came around, the front wheel had

touched the track; the right front wheel came off the plank-ing and struck this rail, that is, the rail next to me, the way I was coming up, and it skidded me down the track. I put the brake on and jumped off as I saw it. It probably went three or four feet before it stopped.'" The plaintiff was denied the right of recovery in that case, and the judgment reversed; it appearing that the plaintiff was guilty of con-tributory negligence, as a matter of law.

Where the view of the track is obstructed, the traveler on a street or highway must exercise greater care and caution, but in a case such as this his very caution lulled him into a feeling of security, and the delay incident insured the colli-sion. Provided the driver of a vehicle may stop in a safe place, he must stop in self-protection after he has actually entered upon the right of way of a railroad at a grade cross-ing, if necessary; but no more is required than that he shall exercise such degree of vigilance and caution to avoid acci-dent as a reasonably prudent man would do under like circum-stances. As was well said by Mr. Justice Angelotti, speaking for the supreme court of California, and applicable to the facts in the case before us: "If he looked and listened at-tentively, and could not see or hear the train [locomotive], and proceeded to leave his place of safety and enter upon a place of danger only after so doing, it cannot be held that he was guilty of negligence as a matter of law in starting forward to cross the track." (*Bilton* v. *Southern Pac. Ry. Co.*, 148 Cal. 449, 83 Pac. 443.)

And this rule applies more pertinently to the facts in the instant case, where the defendant negligently obstructed both the crossing and the plaintiff's view of the track beyond. In our opinion, the evidence is such that the question of con-tributory negligence was properly submitted to the jury for determination as one of fact.

2. From a careful study and review of all of the evidence [2] and giving to it force and effect most favorable to the plaintiff, we are forced to the conclusion that an award of so

great an amount of damages was unwarranted. It can only be accounted for on the theory of the passion and prejudice of the jury against the railroad, so that this court is called upon either to reduce the amount, or again have the question submitted to a jury for determination.

If the record afforded us any substantial basis to reduce the amount of the judgment based upon the verdict, we should not hesitate in reducing it materially. We are left in the realm of speculation and have no basis upon which to declare the proper amount to be allowed the plaintiff as his damages; to do so would be to substitute ourselves for the jury. Mr. Justice Farr, speaking for this court in the case of *Gillespie* v. *Great Northern Ry. Co.,* 63 Mont. 598, 208 Pac. 1059, has declared the rule as follows: "The verdict of a jury is entitled to great weight when rendered on evidence reasonably sufficient to sustain it, but when rendered contrary to the evidence, or against the great preponderance of the evidence, it becomes the duty—not merely the right—of the court to set it aside, reluctant though we are to grant a new trial on that ground alone. (*Wegge* v. *Great Northern Ry. Co.,* 61 Mont. 377, 203 Pac. 360.) If the excessiveness of the verdict could be accounted for on any ground other than passion or prejudice, a new trial would not be granted, but the verdict would be reduced. Only when it is clear that the excessiveness of the verdict is a result of miscalculation, as is sometimes the case, should a court reduce it. (*Hall* v. *Northern Pac. Ry. Co.,* 56 Mont. 537, 186 Pac. 340.) The matter of ascertainment of damages in a personal injury action is essentially a question for the jury, and this court should not be called upon to take the place of a jury in fixing the amount of plaintiff's recovery in any given case."

More than twenty years ago Mr. Chief Justice Brantly well stated the rule in this jurisdiction applicable in this class of cases, as follows: "Courts are reluctant to interfere with the verdict of a jury, and will not do so, on the ground of excessive damages given under the influence of passion or preju-

dice, unless it is apparent that their feelings of passion and prejudice have entered into and influenced their decision. Where it is apparent that this is the case, a new trial should be granted, unless it is also apparent that the verdict is otherwise correct, and the ends of justice will be fully served by requiring the successful party to remit the excess. In the latter case, however, it should appear that upon the facts the successful party is clearly, and as a matter of law, entitled to a verdict in some amount, and that the prejudice and passion of the jury have gone no further than to lead them to swell the amount of damages; otherwise all their deliberations must be deemed to have been permeated by their feelings, and the decision as a whole the result of passion, rather than of their calm, deliberate judgment." (*Helena & Livingston S. & R. Co.* v. *Lynch,* 25 Mont. 497, 65 Pac. 919; see, also,. *Chicago T. & T. Co.* v. *O'Marr,* 25 Mont. 242, 64 Pac. 506.)

In this case, as in the *Gillespie Case,* the amount of the verdict is not justified by the evidence, and can be accounted for only by reason of passion and prejudice; accordingly a retrial is necessitated.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Associate Justices Farr and Holloway and Honorable Roy E. Ayers, District Judge, sitting in place of Mr. Chief Justice Brantly, disqualified, concur.

Mr. Justice Cooper: I dissent for the sole reason that to my mind the evidence furnished foundation enough to make the award no more than fair compensation for the injury inflicted upon the plaintiff.