STANLEY SZTABA, Plaintiff and Respondent, v. GREAT
NORTHERN RAILWAY COMPANY, a Minnesota Cor-
poration, and MARVIN HANSON, Defendants and Appel-
lants.
GREAT NORTHERN RAILWAY COMPANY, Cross-Claim-
ant and Appellant, v. VITALI TILE COMPANY, a South
Dakota Corporation, Cross-Defendant and Respondent.

No. 10819.
Submitted May 10, 1965. Decided February 10, 1966.
Rehearing denied March 3, 1966.
411 P.2d 379.

James O. Garden, Wolf Point, Weir, Gough & Booth, Edwin S. Booth (argued), Cordell Johnson (argued), Helena, for appellants.

Brattin, Habedank & Cumming, Sidney, Whiting, Lynn, Freiberg & Schultz, Rapid City, S. D., Otto T. Habedank (argued), Sidney, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This appeal is taken from plural judgments—the first by defendants-appellants Great Northern Railway Company, a Minnesota Corporation, and Marvin Hanson, its engineer employee from a judgment in favor of plaintiff-respondent Stanley Sztaba for $61,000; the second by defendant-appellant rail-

road from a judgment in favor of cross-defendant and respondent Vitali Tile Company for $1,500.

Plaintiff Sztaba, who was then an employee of the Vitali Tile Company, was the driver of a Vitali Tile Company pickup truck involved in a collision with a Great Northern freight train at the Macon Crossing, five and one-half miles east of Wolf Point, Montana, about 4:00 P.M. on April 3, 1962.

The cause was tried to the court, sitting without a jury.

The complaint stated three claims based on (1) primary negligence of Great Northern and its employee Hanson, engineer of the freight train; (2) the doctrine of last clear chance, and; (3) wilful and wanton negligence and reckless disregard for the traveling public. The claim based on last clear chance was dismissed by the court on the defendants' motion.

The defendants by answer placed the allegations of negligence in issue. The defendants further alleged contributory negligence on the part of the plaintiff, and the defendant Great Northern then counterclaimed against plaintiff Sztaba in the amount of $2,192.71 for damages to railroad property at the crossing, and cross-complained against the Vitali Tile Company for damages to the same property in the same amount.

The record reveals that State Highway No. 13 crosses the Great Northern line at what is known as the Macon Crossing, about five and one-half miles east of Wolf Point, Montana. There are three sets of tracks at this crossing: the main track (northern-most track); the passing track (center track); and the industrial track (southern-most track).

The distance between the northern-most rail of the main track and the southern-most rail of the industrial track is approximately 48 feet. Just to the north of the north rail of the industrial track, between that track and the passing track, an automatic electric Griswold crossing warning sign is located. This sign consists of the usual railroad crossbuck sign, two red lights which flash alternately, and a "STOP" sign which,

when activated, rotates 90 degrees so that its command faces oncoming traffic to the south.

Other warning signs were located along the highway's approach to the crossing. Measurements made from the south rail of the industrial track show that eleven feet south therefrom is a sign reading "3 TRACKS"; a "SLOW" sign is located south at a distance of 226 feet; a "ROUGH BREAK AHEAD" sign is located south at a distance of 351 feet; and finally, at a distance of 488 feet is located a round railroad sign, called an "advance warning" sign.

The freight train involved in this case was 91 cars, or nearly a mile, in length. It approached the Macon Crossing from the west at a speed of 59 miles per hour.

The area surrounding the crossing is for the most part level.

A panoramic view photograph taken with the camera on the highway 1,000 feet south of the center of the main line track discloses to the left of the highway, being westerly, a string of tank cars extending to a grain elevator and associated buildings and then an open space until a string of grain storage bins is reached, then level open country beyond. To the right of the highway and on the north side of the railroad tracks appears a refinery complex. Utility poles are visible along the highway and also to the west above the tank cars and between the elevator and grain storage bins.

Another panoramic view photograph taken with the camera on the highway 600 feet south of the center of the main line track clearly indicates the presence of a railroad crossing and the trackage to the west becomes more visible to one traveling north on the highway since there is a view between the rows of grain storage bins which are erected in rows running east and west. As one approaches from the south and comes closer to the crossing and at about a distance of 230 feet from the south rail of the industrial track, the westward railroad tracks are totally obscured from vision. Total restriction of the westward view continues until the traveler is within about

100 feet of the southernmost rail, from which point onward the westward view rapidly expands and deepens.

Obstruction of the westward view is caused by a series of conditions, the first of which is the complex of grain storage bins before mentioned. The second obstruction consists of a house, trees and a grain elevator. The elevator building is 100 feet in length and is adjacent to the industrial track. The house and trees stand directly to the rear of the elevator, the two buildings together forming an obstruction some 125 feet deep as measured southward from the industrial track, and is some 584 feet west of the crossing. The third obstruction in this series consists of 16 railroad oil tank cars which were "spotted" four days prior to the accident on the industrial track. The eastern-most tip of this string was 90 feet west of the west edge of the crossing. The western tip of the string of cars was more than 584 feet from the crossing—or, in other words, beyond the eastern edge of the grain elevator.

The vision available to the motorist as he approached from the south of the railroad tracks to the west of the crossing, under the above-description of the obstructions, consisted of an ever changing intermittent oblique "V-angle" of sight, the edges of which, to the south, were the grain storage tanks and to the north the house, trees and grain elevator. Regardless of the speed of the car this "V-angle" of vision would have revealed the engine when a point about 100 feet south of the crossing was reached, being approximately 130 feet from danger, at which point the view around and past the eastern tip of the tank cars increased and lengthened.

The witness Curtis L. Nicholson, employed by the defendant railroad with the title of assistant engineer of plats and photography, whose duties included the preparation of plats relating to the scenes of accidents, after plotting lines of sight upon a plat which had been prepared entirely from actual measurements, but using the location of the tank cars as testified to by the highway patrolman who measured the distance from the

crossing to the east end of the tank cars on the day of the accident, testified that from a point 75 feet south of the center of the main line of the railroad one can see the center of the track to the west of the crossing 209 feet. From a point 50 feet south of the center of the main line of the railroad one can see the center of the track to the west of the crossing 468 feet.

The testimony shows that the stopping distance for a motor vehicle traveling at 20 miles per hour is 37 feet; for one traveling 30 miles per hour the stopping distance is 70 feet.

The engine whistle and bell were sounded; the engineer testified that he started the crossing whistle signal about the west end of the industrial track which would be approximately 1300 feet west of the crossing and turned on the automatic bell ringer. While there is conflicting testimony to the effect that the whistle and bell were not sounded until the train was within 600 feet of the crossing, the whistle and bell were sounding when the engine came to a point where it could have been seen by one in the pickup. The engineer kept a lookout which revealed the approaching truck when it was less than a quarter of a mile south of the crossing and again when it emerged from behind the standing tank cars; the front of the engine was probably 150 feet from the crossing at that time; observing that the truck was not going to stop the engineer immediately reached for the brake valve and set the brakes in emergency and the engine struck the truck. Measurements taken following the accident indicate that the left front wheel of the truck was seven feet over the northernmost rail of the main track, the rear wheels of the pickup were in the center of the crossing between the rails. Scuff marks or skid marks upon the crossing from the wheels at time of impact went sideways.

It is clear that the signal at the Macon Crossing, as shown by the testimony of an eyewitness, did give warning of impending danger. The witness testified that when the train was "near the elevator" he saw the "STOP" board on the Griswold

signal turn, thereafter facing southward and sending its warning and command to travelers approaching the crossing from that direction. In addition, witnesses for the defendant Great Northern testified that if the "STOP" board had been activated, thereby rotating 90 degrees, then necessarily the red flashing lights also were activated, since the same mechanisms served to trigger both forms of warning. But there is conflicting testimony as to whether, in fact, the red lights did flash. Evidence submitted by the defendant tends to show that the lights could not have been observed by anyone located where these several witnesses were located, due to the wide angle between the direction in which the lights were aimed and the point of observation of the witnesses. After the accident occurred, the "STOP" board was found in a position facing southward, but the red lights were not flashing because the power source and the relay system associated with the operation of the lights had been torn out and destroyed during the course of the accident.

The defendants' testimony indicates that this Griswold signal operates when a train reaches the activating circuit, and that the activating circuit for the main line on trains eastbound is 2,800 feet west of the crossing. Further, that in the event there was any signal failure the lights would flash and the stop board would go to the stop position and would remain there until repairs were made, and that in the event the light circuit was out that the stop board would be in a stop position.

It is apparent that the weather was sunny and clear; that the highway was clear, dry and straight; that the pickup truck was not mechanically defective; that the plaintiff crossed the Macon Crossing at a speed of from 20 to 30 miles per hour; that the plaintiff did not stop his pick-up truck prior to attempting to pass over the crossing; that the plaintiff had no seeing or hearing disability; that the brakes on the pickup were good and that there were no skid marks indicating any application of brakes on the pickup.

Plaintiff and his passenger in the pickup testified that their

last recollection before the accident was when they stopped and discussed whether they would go to Poplar or Nashua and they made up their minds to go to Poplar and took off. The next recollection of the two men is waking up in the hospital.

Upon cross-examination plaintiff testified that at the point where this stop was made he could see the elevator and the refinery at Macon; that he had crossed the crossing many times prior to the accident; from his past experience of going across that crossing he knew there were some signals, electric flashing signals, at that crossing. He also admitted he received a ticket from the highway patrol as the result of the accident because he went through a stop light.

The district court made findings of fact and conclusions of law in general to the effect that a grain elevator 584 feet west of the Macon Crossing, plus railroad tank cars standing between the crossing and the elevator, obstructed the plaintiff's view of the tracks to the west of the crossing and created an undue hazard to the plaintiff's view thereof; that the defendants knew the crossing was obstructed and would be used by persons unfamiliar therewith; that the plaintiff was entitled to believe the standing tank cars constituted a standing freight train which activated the electric warning at the crossing, if there was any such warning, and that all such warning signals were properly associated with the standing train; that the plaintiff did not and could not with reasonable diligence view the rapidly approaching train and had no reasonable opportunity to avoid an accident after reaching a point where proper vision was secured, and that the defendants knew or reasonably should have known of this state of affairs; that the plaintiff's failure to stop upon reaching the nearest rail of the crossing was not a direct, proximate or contributing cause of the collision; that the defendants failed to prove contributory negligence on the part of the plaintiff; that defendant Hanson negligently and carelessly operated the train at a speed of 59 miles per hour despite the hazardous condition of the crossing; that the defendant Great Northern's act of placing the

tank cars as placed was wilful, wanton, and reckless conduct likely to prove disastrous to motorists approaching the crossing from the south, and; that all injuries are the direct and proximate result of the wilful, wanton, and reckless placement of the tank cars in such a way as to obscure the crossing and the negligent operation of the defendant's train upon its tracks.

Judgment was entered pursuant to the findings and conclusions. Defendants moved for amended and additional findings under Rule 52(b), M.R.Civ.P., and moved for a new trial under Rule 59, both motions were denied. Thereafter defendants appealed from the judgments.

While many errors are specified by the appellants we do not deem it necessary to consider and decide all issues raised. To do so would unnecessarily extend this opinion and in our view the crux of the case is whether or not the defendants were guilty of primary negligence or wilful and wanton conduct, and whether or not the plaintiff is guilty of contributory negligence which was interposed as a defense.

First, it is necessary to determine the cause in fact of this accident and the resultant injuries to the plaintiff. It is recognized that a judge, sitting without jury, understandably has a difficult time keeping the four issues of a negligence claim (cause, duty, negligence and damage) separate, for the judge must perform the functions of both judge and jury.

Causation is a fact. It is important to determine causation first to avoid its confusion with the issues to follow. This is not a relationship between negligence and injury, but rather a causal relation between conduct and hurt, both of which are factual concepts. It is only after the causal relationship, duty, and its scope are found that the negligence issue is reached. 61 Col.L.R. 1401.

The test most generally employed in determining causation is the "but for" test. Montana has adopted this test in numerous cases.

Proximate cause is one "which in a natural and con-

tinuous sequence, unbroken by any new, independent cause, produces the injury, and without which the injury would not have occurred." Stroud v. Chicago, M. St. P. & P. Ry. Co., 75 Mont. 384, 393, 243 P. 1089, 1092.

The district court made findings of fact to the effect that the direct and proximate cause of the accident and injuries were the defendant Hanson's operation of the train and the defendant Great Northern's *act* of placing the tank cars so as to obstruct the view.

At most, the "but for" or *"sine qua non"* test is but one of exclusion. In other words the defendant's conduct is not the cause of the event, if the event *would* have occurred without it.

The defendant Great Northern's *act* of placing tank cars on the industrial track is not of itself a fact causing the injury. But the resulting additional obstruction of view is a condition within the causal relationship. Likewise, the fact that the plaintiff did not stop before entering upon the crossing is within the causal relationship between conduct and hurt. These facts or conditions are not excluded from possibility by the "but for" test. The accident would not have occurred but for the obstructed view of the track, or, converse, the obstructed view was not a cause of the accident if the accident *would* have occurred without such obstruction. Similarly, but for the plaintiff's failure to stop, the accident would not have occurred —or, the plaintiff's failure to stop is not a cause of the accident if the accident would have occurred without it. The speed of the train may be considered a cause under the same test. Failure to apply brakes to the freight train thereby slowing its speed might likewise be considered within the causal relation.

The district court's finding that plaintiff's failure to stop his pick-up truck before attempting to pass over the crossing was not a proximate cause of the injury was erroneous.

Several general rules of railroad crossing law set the stage for more critical analysis of the duty issues in this case.

One of the highest obligations of the railroad is to protect the public at highway crossings. Incret v. Chicago, M., St. P. & P. Ry. Co., 107 Mont. 394, 412, 86 P.2d 12.

Both the railroad and the motoring public have an equal right to the use of a crossing. Sprague v. Northern Pac. Ry. Co., 40 Mont. 481, 487, 107 P. 412; Walters v. Chicago, M., St. P. & P. Ry. Co., 47 Mont. 501, 507, 133 P. 357, 46 L.R.A., N.S., 702.

A railroad crossing is of itself a warning of danger. Roberts v. Chicago, M., St. P. & P. Ry. Co., 67 Mont. 472, 479, 216 P. 332; Monforton v. Northern Pac. Ry. Co., 138 Mont. 191, 203, 355 P.2d 501.

The railroad company has the right of way over its own tracks and crossings. Incret v. Chicago, M., St. P. & P. Ry. Co., 107 Mont. 394, 411, 86 P.2d 12. Wrzesinski v. Chicago, M., St. P. & P. Ry. Co., (D.C.Mont.1962) 207 F.Supp. 460, 463. This rule of law applies only when due notice of the approach of a train is given. R.C.M.1947, § 72-219, sets the minimum standard of warnings to be given by trains approaching crossings—that being the ringing of the bell and the blowing of the whistle. Additional warnings are required by R.C.M.1947, § 72-164, when a crossing is extra-hazardous.

The rule that trains have the right of way over their own lines permits the operators of the trains to raise an assumption that, under normal circumstances, an approaching traveler will stop his vehicle before endangering himself, "which assumption is of particular force where the train is approaching rapidly * * *. Under ordinary circumstances, therefore, no legal obligation exists for the railroad company to slacken the speed of its trains at country crossings." 3 Blash. Auto. 83, § 1710. Railroads are not insurers of the safety of persons approaching their tracks for the purpose of crossing. Grisamore v. Atchison, Topeka & Santa Fe, 195 Kan. 16, 403 P.2d 93 (1965).

As will be shown, Montana cases strongly indicate

that signals and warnings, from the train engine or from signals and signs located at crossings, need not be so effective as to amount to a guarantee of safety to the traveler using a crossing.

While the court found this crossing to be extra-hazardous, in our opinion the facts here do not support such a finding.

■ A search of earlier Montana cases concerning extra-hazardous crossings brings out the following definition: Where vision or hearing of the approach of railroad vehicles to a crossing is impaired, obscured, or not clear and distinct; or where the crossing itself is obscured from view, or not fully clear and distinct; or where the facts concerning the situation, surrounding, use, unusual circumstance or peculiar environment tend to indicate unusual danger; or where ordinary prudence will not insure safe passage, a crossing is deemed to be extra-hazardous. Norton v. Great Northern Ry. Co., 78 Mont. 273, 284, 254 P. 165; Jarvella v. Northern Pac. Ry. Co., 101 Mont. 102, 113, 53 P.2d 446; Broberg v. Northern Pac. Ry. Co., 120 Mont. 280, 290, 182 P.2d 851; 3 Blash.Auto. 180, § 1791.

The above definition is compatible with R.C.M.1947, § 72-164, which empowers the Montana Railroad Commission to order extra-statutory signals installed at a crossing where "the contour of the country adjacent to said crossing is such that a person approaching same along said highway cannot, at a distance of twenty-five (25) feet of said crossing, obtain an unobstructed view of said railroad track for a distance of one-half (½) mile on either side of said crossing; or where any other hazardous conditions exist which make it advisable that electric signaling devices be installed * * *."

■ Here the crossing was clearly visible, there does not appear to be any unusual circumstance or peculiar environment that would have prevented safe passage if ordinary prudence was observed. It is true that vision of approaching trains was at times obscured, but as we shall later point out, if ordinary prudence was exercised by a person approaching and going

upon the visible railroad crossing, the collision would have been avoided.

Assuming, arguendo, that it was an extra-hazardous crossing, then the following general rule would be applicable:

"Where obstructions to view and hearing, making a crossing more hazardous, exist at or near a railroad crossing, whether or not produced by the conduct of the company, their presence is a circumstance of considerable importance in determining what conduct is required in the exercise of due care, and *it is the duty of both motorist and the railroad,* if they are apprised or reasonably should be apprised of the existing state of affairs, *to use such care on approaching the crossing as is commensurate with the increased hazard occasioned by the obstruction, to wit, ordinary care under the circumstances.*" (Emphasis ours.) 3 Blash.Auto. 193, § 1795.

Montana has used similar language in the following cases: Wrzesinski v. Chicago, M., St. P. & P. R. Co., supra; Broberg v. Northern Pac. Ry. Co., supra, 120 Mont. at page 295, 182 P.2d 851; Everett v. Hines, 64 Mont. 244, 261, 208 P. 1063; Hunter v. Montana Central Ry Co., 22 Mont. 525, 531, 57 P. 140. See also 44 Am.Jur. 747, § 507.

Neither the railroad nor its employees need anticipate that a motorist will be negligent, Grisamore v. Atchison, Topeka & Santa Fe Ry. Co., supra.

In the Wrzesinski case, supra, the court there held that the railroad "had fulfilled its duty to give adequate warning to the public of the approach of its trains under the circumstances" through the use of a Griswold signalling device similar to the one used at the Macon Crossing. But the difference in circumstances in the Wrzesinski case from the case at bar is that the railroad crossing there in question was located within the city limits of Ryegate, Montana, while the crossing here in question is located on a highway in open country. The standard of ordinary care to be exercised at railroad crossings by both the railroad and the motorist depends to a

large extent upon whether the crossing is a "rural" or an "urban" crossing because of the different state statutes and city ordinances which control speed and determine carelessness under the varying conditions of urban and rural travel. It is not realistic, therefore, to apply rules of law created upon facts involving an accident at an urban railroad crossing to another case involving an accident at a rural crossing. The standard of care required under each circumstance, for both the railroad and the motorist, is different.

The standard of care incumbent upon a motorist on our highways is not of a constant degree. Rather, the standard or degree of care is continuously modified by the surroundings and conditions through which the motorist passes. A condition of high danger, either to himself or to others, increases the standard of care he must exercise. Speed and lookout and control are essential elements of the care required. Therefore, facts concerning the surroundings and the conditions present at the time the motorist approaches a railroad crossing are of critical importance in determining the standard of care required of him. It is not realistic in this age of advanced mechanical capabilities—high speed—to apply the same standard of care to motorists approaching a crossing within a city, where speeds are limited and controlled, to the same motorist approaching a country crossing where speed is not limited or controlled. And since the plaintiff's speed in this case, even though travelling an open highway, was between 20 and 30 miles per hour, it is not necessary at this time to attempt to establish a ratio of duty between the railroad and a motorist travelling at greater speed.

The facts present in this case, for the purpose of eliminating earlier Montana cases concerning crossing accidents not similar to this one, are: (1) this was a country or rural crossing, not an urban or city crossing; (2) the view of approaching trains was at times obscured, not at all times clear and distinct; (3) the crossing was unoccupied until the collision occurred, in other words, a train was not then passing over or

standing upon the crossing into which the motorist ran. Research reveals five cases where crossing accidents have occurred under the above three conditions: Hunter v. Montana Central Railway Co., 22 Mont. 525; 57 P. 140; Sprague v. Northern Pac. Ry. Co., 40 Mont. 481, 107 P. 412; Mason v. Northern Pac. Ry. Co., 45 Mont. 474, 124 P. 271; Walters v. Chicago, M., St. P. & P. Ry. Co., 47 Mont. 501, 133 P. 357, 46 L.R.A.,N.S., 702; Rau v. Northern Pac. Ry. Co., 87 Mont. 521, 289 P. 580.

The Mason case, supra, is distinguishable from the instant case in that therein a minor was the driver of the vehicle, such fact having an important influence upon the standard of care required of him.

The remaining four cases, although different from the case at bar in many ways, are similar as to the basic fact situation, as stated above, and reveal the following rules of law concerning accidents occurring under such conditions.

In the Hunter case, supra, 22 Mont. at page 531, 57 P. at page 142, this court stated that the "amount of care to be exercised depends somewhat upon the special circumstances of each case. In general, the more obstructed the view * * * the greater is the duty to use watchfulness and care." The court also said that a driver must exercise "at least ordinary diligence and prudence; so that * * * one, upon approaching a railroad crossing intending to pass over it * * * [must] make a vigilant use of his senses,—that is, to look or listen, and to stop for this purpose, if necessary, to learn if there is danger * * *."

The Sprague case, supra, 40 Mont. 481, 490, 107 P. 412, 414, cited the Hunter case and added the following thereto: "The duty to look and listen requires the traveler to exercise care to select a position from which an effective observation can be made. The mere fact of looking and listening is not always a performance of the duty incumbent upon the traveler, for he must also exercise care to make the act of looking and listening reasonably effective."

The Walters case, supra, 47 Mont. 501, 508, 133 P. 357, 358, properly cites both Hunter and Sprague, and adds the following from the Mason v. Northern Pac. Ry. Co. case, supra, wherein the latter case is referring to certain instructions which were held to be improper: "If such were the law a person approaching a railroad track would either be obliged to keep a constant lookout in both directions, or it would be incumbent upon him, in order to avoid the imputation of contributory negligence, to stop, if necessary, and look for a train at the last available point, and at the last moment of time, before crossing the track. The law is that one desiring to cross a railroad track must exercise reasonable care for his own safety." The effect of this rule is that a traveler is not guilty of contributory negligence as a matter of law if he fails to stop before crossing railroad tracks.

The Rau case, supra, 87 Mont. 521, 289 P. 580, is distinguishable from the case at bar and from the basic fact situation described above because there the motorist stopped to await the passage of a freight train going east, and was struck as he then proceeded over the crossing by a passenger train going west. The moving freight train was the only obstruction to his view:

The following quotations from 3 Blash.Auto. 206-252, §§ 1811-1816, in general affirm the above case law.

"Where a motorist approaches an unusually dangerous crossing, the care required of him depends in general upon the circumstances, and is commensurate with the danger involved. He is not, however, required to exercise care to ascertain whether a crossing is unusually dangerous, but only to use care to learn of the existence and location and then, if he sees or knows it to be exceptionally hazardous, to exercise commensurate care to prevent injury." 3 Blash.Auto. p. 206.

"The use of one's senses to discover the approach of a train, so important even at ordinary crossings where no special risk exists that it is in most jurisdictions made a specific duty of travelers on the highway, is not excused, nor is the degree of

alertness which the law demands diminished, by the existence of obstructions to hearing and seeing; instead such *obstructions serve rather to demand from the motorist increased vigilance.*" (Emphasis ours.) 3 Blash.Auto. p. 217.

"If, during part of his course, the motorist's vision along the track is obscured, it is his inflexible and imperative duty to avail himself of every unobscured opportunity; if a partial obstruction of vision or hearing exists, to make every effort to overcome such obstruction. Where numerous obstructions combine to continue to hinder his view up until he reaches the principal point of danger, located on the main track, the care required of the motorist increases in direct proportion as his distance from such danger point decreases. 3 Blash.Auto. § 1816, p. 219.

"When a motorist, undertakes to cross a series of tracks, on one of which cars or trains stand, preventing a view of trains approaching on more distant tracks, he should look after passing the objects obstructing his view in order to satisfy the requirement of due care, and this is, of course, all the more true where the rolling stock which intercepts the view also interferes with hearing." 3 Blash.Auto., § 1827, p. 252.

Once the duty has been established it can then be determined whether the performance or the conduct required therewith, or the omission of acts and conduct, amounts to negligence, or, in other words, whether the conduct violated the duty owed.

As for the railroad in this case, the act of placing the tank cars was of itself not negligent, even though it caused additional restriction of an already restricted view. We feel that in the case at bar, the railroad did not act in a wilful and wanton manner with reckless disregard for the safety of the traveling public. The installation of the Griswold signal at the crossing refutes such a contention.

This Griswold electric signal, installed at the Macon Crossing in 1931, is a form of extra precaution taken by the railroad company designed to increase the warning of danger

from approaching trains. The installation of such a signal carries with it the duty to maintain it in proper working order. The record shows that the railroad company did in good faith maintain and regularly service this signal—the same having been checked the very day of the plaintiff's accident but a few hours prior thereto. Once installed, if the railroad company in good faith endeavors to maintain the signal in proper working order, a failure of the signal on a given occasion does not of itself show negligence. See 90 A.L.R.2d 350 at 353.

 The conduct of the plaintiff violated the duty, or standard of care incumbent upon him under the circumstances.

The evidence shows that the plaintiff drove onto the crossing without stopping his automobile when commanded to do so by the "STOP" board on the Griswold signal. The act of failing to stop in this particular case is not made negligent by any absolute duty on the part of the plaintiff to stop at a railroad crossing, but rather the failure to stop is deemed negligent conduct because of the plaintiff's failure to obey the "STOP" command on the warning signal upon the crossing.

In addition to this negligence, there is sufficient evidence in the record to show that once upon the crossing, the plaintiff neither looked nor listened when the opportunity to do so presented itself. Approaching at a speed of 20 to 30 miles per hour, if the plaintiff had looked, he could have seen the approaching engine of the train when he still had sufficient stopping distance available. Testimony and exhibits show that he neither hastened nor slowed the progress of his automobile, that he did not swerve or change the direction of the pick-up truck, or made any other attempt to avoid the impending collision. In short, it appears that the plaintiff was totally unaware of the approaching train. If he had listened, he could not have failed to hear the whistle of the approaching train, for it is well-established in the record that the whistle was blowing and the bell was ringing as the train approached, reached and passed over the crossing.

The plaintiff's conduct breached the standard of care required of him under the circumstances and such violation of the duty owed was negligence. This negligent conduct contributed to and proximately caused the accident and following injuries to the plaintiff.

■ Contributory negligence is best explained as being a part of the theory of proximate cause. In Tiddy v. City of Butte, 104 Mont. 202, 208, 65 P.2d 605, 608, this court said:

"In considering the question of contributory negligence, it is necessary to take into account the proximate cause of the injury in connection with the contributory negligence alleged * * * [so that] to bar recovery by plaintiff in a personal injury action on the ground of contributory negligence, it is not sufficient that he was negligent; it is only when his negligence contributed to the injury at the time it was inflicted and was a proximate, and not a remote, cause of the injury that he cannot recover."

■ Authority affirming this contention is too numerous to cite. Montana adheres to a strict formula of proximate cause. Dahlin v. Rice Truck Lines, 137 Mont. 430, 352 P.2d 801; Wolf v. Barry O'Leary, Inc., 132 Mont. 468, 474, 318 P.2d 582. It is well-settled law in this jurisdiction that once negligence on the part of the plaintiff is found, and such negligence concurs and cooperates with the negligence of the defendant to proximately cause the plaintiff's injuries, then the plaintiff is barred absolutely from recovery. The doctrine of comparative negligence, although gaining recognition in other jurisdictions, is not available in Montana. Hughey v. Fergus County, 98 Mont. 98, 107, 37 P.2d 1035. See 62 Yale L.J. 691.

For the above reasons, the plaintiff cannot recover from the defendants Hanson and Great Northern, his claim being barred by his own contributory negligence. Under the facts presented at the trial, the lower court should have, as a matter of law, so found.

■ Such being the case Vitali Tile Company cannot recover its damages from the defendant railroad.

This bring us to the counterclaim of the Great Northern against plaintiff and their cross-complaint against Vitali Tile Company for damages to the railroad property at the crossing.

We have found the plaintiff to have been contributorily negligent.

"The defense of contributory negligence is one which admits, or at least presupposes, negligence on the part of the defendant, and the party at fault thereby seeks to cast upon the plaintiff the consequence of his own failure to observe the precautions which the circumstances of the case demanded." Baltimore & Potomac Railroad Co. v. Cumberland, 176 U.S. 232, 238, 20 S.Ct. 380, 382, 44 L.Ed. 447.

"Contributory negligence presupposes negligence, and can exist only as a coordinate or counterpart." Martin v. Highland Park Mfg. Co., 128 N.C. 264, 38 S.E. 876.

As stated in Freschi v. Mason, 108 N.J.L. 272, 156 A. 758: "The concept of contributory negligence is an inseparable companion to that of primary negligence, and, in the absence of the latter, plaintiff's negligence is not contributory but sole." See, also, 38 Am.Jur. Negligence, § 177.

This being the concept of contributory negligence the defendant railroad should not recover upon either its counterclaim or cross complaint.

The judgments are reversed and the cause is remanded to the district court with instructions to enter judgment in accordance with this opinion.

MR. JUSTICES JOHN CONWAY HARRISON, DOYLE and CASTLES concur.

MR. JUSTICE ADAIR dissenting:

I dissent and reserve the right to hereafter file such written dissent.