BROBERG, RESPONDENT, v. NORTHERN PAC. RY. CO., ET AL., APPELLANTS.

No. 8675

Submitted April 21, 1947. Decided July 1, 1947.

182 Pac. (2d) 851

Messrs. Coleman, Jameson & Lamey, James H. Kilbourne and James M. Haughey, all of Billings, for appellants.

Messrs. Hennessy & Hennessy of Billings, Mr. M. J. Doepker, of Butte, and Mr. L. W. Swords, of Billings, for respondent.

MR. JUSTICE CHOATE, delivered the opinion of the Court.

Defendants appeal from a judgment of the district court of Yellowstone county in favor of plaintiff in an action for damages for personal injuries received in a highway crossing collision between an automobile, in which plaintiff was riding, and a railway train operated by defendant railroad company.

Defendants assign 20 specifications of error. The first three

284

relate to the court's denial of defendants'· motion for nonsuit and for a directed verdict and present the contention that defendants should have prevailed as a matter of law. Specifications Nos. 4-14, inclusive, relate to the giving and refusal of instructions. Specifications Nos. 15-19, inclusive, have to do with alleged errors in the admission of evidence and specification No. 20· pertains to the denial of defendants' motion to re-tax costs.

*Review of evidence.* ·Mindful of the fact that as in most cases ▪ of this character the testimony is conflicting and that upon motion for nonsuit or directed verdict the evidence must be viewed from the standpoint most favorable to plaintiff (Jarvella v. Northern Pac. R. Co., 101 Mont. 102, 53 Pac. (2d) 446; Mellon v. Kelly, 99 Mont. 10, 41 Pac. (2d) 49; Nangle v. Northern Pac. R. Co., 96 Mont. 512, 32 Pac. (2d) ·11), we will review what we consider the material facts disclosed by the evidence, particularly those bearing upon the visibility of the crossing and whether or not a jury question was presented as to said crossing being unusually hazardous.

The collision involved in this action occurred November 10, 1943, at about 6 :45 p. m., or one hour after sunset at what is known as the Dennis Beet Dump Crossing, about seven miles northeast of Billings at a point where U. S. Highway No. 10, a heavily traveled highway, intersects at grade a spur track known as the Shepherd branch of the Northern Pacific Railway Company. This spur track was used but little, about four to six weeks each year during the best harvesting season. At the point of intersection of the spur track with Highway No. 10, the highway runs approximately east and west while the railroad's spur, the Shepherd branch of the Northern Pacific, extended. in a slightly northeasterly, southwesterly direction. East of the crossing the highway slopes downward 11.6 feet from .3 of a foot at 25 feet east of the crossing to 11.6 feet at 350 to 450 feet west of the crossing. On the night of the collision it was ''cloudy and dark,'' ''very dark and cloudy.'' No moon was shining. The surface of the highway was what is commonly

called "blacktop" and was black in color. About 350 feet east of the crossing and four feet north of the oiled part of the highway there was a standard highway department railroad crossing sign, painted with luminous paint and bearing the letters "R.R." Mr. Ramsey, a highway patrolman, said that "if I remember correctly" this sign was visible and in good shape. However, he based that statement on the fact that it was the duty and custom of patrolmen to report to the highway department any signs that were damaged and that "if this sign had been in bad condition no doubt it would have been reported." To the contrary, Mrs. McFarren testifying as to the condition of the sign at the time of the accident, said that "If there was any sign there before you could not have seen it for weeds. Nobody would ever notice it."

Also on the north side of the highway and near the crossing there was a railroad crossing post, once white in color but which at the time of the accident was "gray and old." Along the north side of the highway on the right-hand side of the road as one travels west in the direction of Billings, there was a row of telephone or telegraph poles bearing a mass of wires characterized by the witness Folkerts as being "as heavy as I have seen on any place I know of." These poles were about 100 feet apart and the lowest cross-arm on the poles nearest the crossing was 30.6 feet above the highway. Still considering the north side of Highway No. 10, adjacent to the crossing, we are confronted with a conflict in the testimony, which in view of the rule already indicated, we must view from the standpoint most favorable to plaintiff. We refer to the testimony concerning the extent of weed growth along the north side of the highway. Defendants have introduced photographs testified to by its district claim agent, Mr. Murray, as having been taken by him at the scene of the collision on November 12, 1943, two days after the accident. (Defendants' Exhibits J, K, K1, K2 and L.) These photographs are identified by the witness Ramsey as correctly representing the condition of the crossing as it existed on the

day of the accident. These photographs, particularly defendants' Exhibit J which was taken 371 feet east of the crossing looking west toward the Dennis Beet Dump Crossing, *do* show some growth of weeds along the highway extending east from the crossing, although by no means such a heavy growth as was indicated by some of the witnesses testifying. On the other hand, the witness Folkerts who had lived in the vicinity of Shepherd since 1917 and was familiar with the highway and crossing in question, testified that "on the other [north] side of the highway there is a field that is always cultivated but it has a high growth of horse weeds all along the fence at all times and you cannot see much, I would say hardly anything until you get right close over there—right when you get to the railroad track."

Mrs. McFarren, who saw the condition of the highway about a month after the accident, testified that "all you could see was straight ahead in the road—there was weeds up to the track and a gradual rise all the way up."

Mrs. DeCosse testified that "there has always been a lot of weeds there along the beet dump—right at the crossing and adjacent to the highway on the north."

Nels Johnson, testifying to the condition of the highway during November, 1943, stated that there were a lot of weeds growing up and that the vision to the right (north) side of the highway was very poor.

Jean Groves testified that she had traveled this road in the year 1943 and that on the north side of the road there was "an irrigation ditch—kind of a high wall like, and weeds, about as tall as I am." To the same effect was the testimony of Frank Hoffman, Jr., that "the righthand side of the road was very much in weeds, tall weeds along the side of the road up to possibly 20 or 30 feet from the crossing" and that one approaching the crossing "could not see through these weeds to the track." Mrs. Hoffman also testified that she knew the road as it existed right before the accident and that there had always been tall

weeds there ever since she could remember. As the highway approaches the crossing the view to the north is at least partly obscured by a high embankment or irrigation ditch and by a heavy growth of sweet clover which adds to the apparent height of the embankment.

Passing now to the south side of the highway and looking west thereon toward the crossing, there is a continuous line of heavily bushed ash trees extending to within a few feet of the crossing. Mrs. Broberg testified that this grove was very thick, the trees planted close together and that it is almost impossible at any time of the year to see through them all and that they do not shed their leaves until late in the fall. Defendants' Exhibit J, on which some leaves are plainly discernable, corroborates this testimony in part.

Defendants' witness Schutt testified that he measured the distance of the nearest tree from the track and that it was 63 feet from the center of the railroad track to the trunk of the tree. The spread of branches from the trunk toward the east rail of the track is not shown.

Immediately preceding the accident defendants had been engaged for some time in switching cars back and forth over the highway crossing, picking up loaded or leaving empty beet cars. At the time of the accident this train, an engine and 11 loaded beet gondolas, was moving southwesterly over the Dennis Beet Dump Crossing at a speed of three or four miles an hour. While these switching operations were in progress at the crossing, the plaintiff and her mother, Mrs. Margaret McFarren, the latter driving her own car, a 1934 Chevrolet sedan, approached the crossing traveling westward toward Billings along Highway No. 10. As she approached the crossing, according to her testimony, she was traveling at an average speed of about 30 miles an hour; her lights were on; they were standard lights and in good condition having been adjusted within ten days prior to the accident; while the car was a used car, it was in good mechanical condition, the brakes were good and the windshield clean; as the

driver of the car approached the crossing she was alert and attentive to her driving and was looking straight ahead. She did not hear any whistle or bell of the locomotive nor did she see any light thereon. Proceeding in the manner indicated, witness testified that "the first thing I noted, the car was right in my face and of course I put my brakes on." Her efforts to stop the car in time to avoid a collision were unavailing and her automobile struck defendants' train in the middle of the 11th or last gondola. (Defendants' Exhibits C to G.) The whole front part of the automobile was forced underneath the gondola car up to the windshield, resulting in plaintiffs' sustaining injuries for which she recovered in the lower court.

As to her distance from the crossing when she first saw the gondola, Mrs. McFarren testified that "I got within 45 or 50 feet, something like that, before I saw the beet car on the track." In another part of her testimony she said that she was no judge but she did not think it was over 30 feet before she saw the car before her. Again she testified that she never saw anything until she saw the train right in her face, "that is the first thing I seen and the only thing I seen."

Appellants' assignments of error Nos. I, II and III, refusal of defendants' motion for nonsuit, motion for directed verdict and request to instruct the jury to return a verdict for defendants, all raise the question whether defendants should have prevailed as a matter of law. Defendants assert that they should have recovered provided any one of three things was established by the proof, namely,

1. That defendants were not negligent,

2. That Mrs. McFarren's negligence was the sole proximate cause of plaintiff's injuries,

3. That plaintiff was contributorily negligent.

We shall review these claims in the order presented. First, were the defendants negligent. Defendants contend, assuming said facts to be true, that they were not negligent in failing to have a flagman at the crossing or to give bell or

whistle signals or to have the engine headlight lighted or failure in any other respect to give warning to plaintiff of the presence of a train on the crossing. Consideration of these contentions leads us at once to the controlling question in the case, namely, was there sufficient evidence to warrant the submission to a jury of the question whether the Dennis Beet Dump Crossing at the time and under the circumstances existing when the collision occurred was an extra-hazardous crossing. The rule of law applicable to extrahazardous crossings has been laid down by this court in the Jarvella and Incret cases (Jarvella v. Northern Pac. R. Co., supra, and Incret v. Chicago, M., St. P. & P. R. Co., 107 Mont. 394, 86 Pac. (2d) 12) and in Norton v. Great Northern R. Co., 78 Mont. 273, 254 Pac. 165. In the Jarvella case we held upon numerous supporting authorities from other jurisdictions that at an *ordinary crossing* where a train has stopped on the crossing or is moving slowly over it, is not negligence on the part of the railroad company in failing to blow the whistle or ring the bell or place warning lights along the train or provide a flagman to warn the traffic. In the Incret case we stated the reason for the above rule which is that a train standing on or passing over a railroad crossing is in itself a sufficient warning of danger to the traveling public unless the crossing be extrahazardous. Finally, in the Incret case, we stated the rule apparently recognized by appellants, that if the crossing is extrahazardous the general rule does not apply.

More completely stated, our holding in the Jarvella case was this: While it is the general rule that it is not negligence on the part of a railway company in failing to blow the locomotive whistle, ring the bell, or to place warning lights along the train where it has stopped on an ordinary crossing or where it is slowly moving thereover, or to provide a flagman to warn the traffic, such failure may, *under peculiar facts and circumstances or under peculiar environments* rendering the situation unusually hazardous, render the company liable for negligence. In that case we also held that in a personal injury action by an auto-

mobilist who collided with a freight train standing on a crossing in the nighttime, the question whether a railway crossing was unusually hazardous at night where nearby buildings accentuated the darkness, the company recognizing its extraordinary dangerous character by the fact that during certain hours it kept a watchman there, and whether the company was negligent in failing either to light the crossing or to maintain suitable warning thereat, was for the jury.

The question as to whether or not the crossing involved in this ▇ action was extrahazardous resolves itself, under the rule approved by this court in the Jarvella case to this: Were there present for the determination of the jury any peculiar or unusual facts and circumstances or any peculiar environment rendering the situation unusually hazardous. The able briefs of counsel on both sides of this case are replete with perfectly logical conclusions based upon conflicting testimony as well as with emphatic assertions that certain portions of the evidence show or do not show an extrahazardous crossing. This opinion would be extended to great lengths were we to review all these conflicting claims. However, bearing in mind the rule that the evidence must be viewed from the standpoint most favorable to plaintiff, we will indicate our views as to the facts which warranted the submission of the case to a jury on the question of the extrahazardous nature of the crossing

1. The oiled blacktop surface of the highway tended to absorb the light of an approaching automobile, thus creating a more than ordinarily dangerous condition for night driving at a railroad crossing. "The extent to which a black surface will absorb the light of an automobile is known to every motorist." Los Angeles & Salt Lake R. Co. v. Lytle, 56 Nev. 192, 47 Pac. (2d) 934, 938, 52 Pac. (2d) 464.

"* * * the court may consider the facts that the dark surface of a street will absorb a large proportion of the light cast upon it and will reflect less light than a street of lighter surface, and

that even a relatively light-colored concrete pavement will absorb a considerable proportion of the light rays cast upon it.

"The dark surface of a railroad car may blend in color with that of the street and the general background at night so that it is difficult to see the obstruction." 161 A. L. R. 121. Citing Los Angeles & Salt Lake R. Co. v. Lytle, supra, and other cases.

2. The night was very dark and the gondola with which the driver of the car collided was black in appearance. In Walsh v. Butte, Anaconda etc. R. Co., 109 Mont. 456, 462, 97 Pac. (2d) 325, a crossing collision case, we held that darkness was one of the conditions to be considered on the question of contributory negligence. "In this connection the courts may consider the facts that a dark railroad car will absorb a considerable proportion of the light rays which strike it, and that a large proportion of the rays which are actually reflected will travel in various directions, so that only a relatively small proportion of the rays will register on the eyes of the motorist." 161 A. L. R. 121. Citing numerous authorities, including the California cases of Mallett v. Southern Pac. Co., 20 Cal. App. (2d) 500, 68 Pac. (2d) 281 and Harper v. Northwestern Pac. R. Co., 34 Cal. App. (2d) 451, 93 Pac. (2d) 821.

3. The approach to the railroad crossing along the highway going west was up a grade. At 25 feet east of the crossing there was a .3 of a foot decline from the crossing; at 50 to 150 feet there was 4.9 feet of total decline from the crossing; at 250 feet from the crossing the road level is 7.7 feet below the level of the crossing and, based on a speed of 25 miles an hour, was six seconds travel time from the crossing. There is sharply conflicting testimony on the question as to whether an automobile approaching along the grade from the east would throw its lights underneath a gondola on the crossing. Mrs. DeCosse who stated that she nearly hit a train at the crossing in question on one occasion, testified as follows: "As one approaches the railroad—you see the railroad is on a grade there somewhat higher than either side of the road—as you approach that from the east, if there is a

car on the other side of the track and a train is on there, you cannot see anything of the train because the car lights shine under the gondola or under the car, and when you are watching the car lights you do not expect to see something above it.''

To the contrary was the testimony of defendants' witnesses Ramsey and Trythall, highway patrolmen, who testified that as an automobile came up the incline to the crossing properly adjusted headlights would not get appreciably closer to the pavement and that the main beam would be projected ahead of the auto so as to strike the surface of the roadway at a point 225 feet ahead of the automobile and that on properly adjusted lights the main beam would drop vertically four inches on each 25 feet of forward projection. Certainly if it was a fact (and it was for the jury to say) that Mrs. McFarren's headlights were shining under the gondola as she approached the crossing, she would quite reasonably ''not. expect to see something above the lights,'' and a peculiar circumstance would be presented, rendering the situation unusually hazardous. We agree with the trial judge that there is substantial evidence that the lights of an automobile coming up the incline from the east shone under the body of the gondola and by reason of the height of the body of the gondola, as well as the height of the car, the lights shone under the car instead of striking the side of the same. The pictures taken immediately following the collision show that the hood of the automobile was under the gondola after the time of the collision.

4. *Weeds, trees and poles.* Credible testimony is presented that the view on the approach to the crossing in question was to a considerable extent obscured by weeds on the north side and by trees on the south side of the crossing as one approaches it from the east. Also on the north side of the highway there was an irrigation ditch or embankment on which was a heavy growth of sweet clover. There was also an irrigation ditch right at the crossing on the south side. Also along the north side of the high-

way there was a row of telephone poles bearing four bars and "lots of wire."

5. *Infrequent use of spur*. The evidence is that the spur track in question was infrequently used, only about four to six weeks in the sugar beet harvesting season. " * * * the fact that the railroad uses the crossing only infrequently may impose upon it a special duty to prevent a collision with a standing train at the crossing, for persons familiar with the fact may be lulled into a false sense of security." 161 A. L. R. 118. Citing numerous authorities including Hendrickson v. Union Pac. R. Co., 17 Wash. (2d) 548, 136 Pac. (2d) ·438, 161 A. L. R. 96.

It is our opinion that the conditions above reviewed were sufficient to take the case to the jury on the question whether their cumulative effect did or did not render the crossing extrahazardous. While every case of this nature must be decided upon its own facts and circumstances, we feel warranted in saying that in our opinion the facts presented in this case are quite as indicative of an extrahazardous crossing at nighttime as those presented in the Jarvella case.

There is also testimony in this case which is capable of interpretation to indicate that while the train was engaged in switching operations over the crossing in question, it was a part of the duties of the train crew to flag traffic upon the highway and that they assumed this burden in recognition of the fact that the crossing was more than ordinarily hazardous under the conditions then existing and the use to which it was being put. Gullard, one of the trainmen, testified that he dropped off the engine eight or ten feet from the highway so that "if we should happen to take cars over the crossing I would be there to warn the automobiles that we were backing across. Another purpose would be, the main purpose would be, to signal the engineer that the cars were off the crossing—out of the siding rather." The witness Summers testified that he observed the automobile approaching the crossing at a distance of 350 to 400 feet, at a speed of 25 to 30 miles an hour. Witness hurried east across the two

railroad grades waving his lantern to the automobile coming up the highway. The inference may be drawn from this testimony that Summers was following his usual and customary duty in flagging highway trafic but that in the instant case the train crew failed to give proper signals or warnings to indicate the presence of the train. Moreover, if it be assumed that Summers *was* carrying out his usual duty to give warning of danger to approaching automobiles at the crossing in question, the case would then come under the rule of the Jarvella decision that customary flagging by trainmen at a highway crossing is recognition of the dangerous nature of the crossing.

*Flagman.* Appellants urge that should the crossing in question ██ ██ be held to be especially dangerous, still the railroad company had discharged its duty to approaching vehicles by reason of the presence of the brakeman Gullard at a point west and north of the crossing for the purpose of flagging traffic if necessary. The rule in that respect is that the railroad company must use care commensurate with the conditions existing. "Where the crossing is especially dangerous it is incumbent on the company to use increased care commensurate with the danger, even though the crossing is not a much travelled and used one." 52 C. J. 211, sec. 1810. Citing cases. Whether or not the brakeman or any other of the train crew had been instructed by their employer to flag approaching vehicles at the Dennis Beet Dump Crossing in the nighttime by the waving of a lantern and whether such method of flagging was adequate in view of the conditions existing, was for the jury to determine. In Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485, the court said: "Neither the legislature nor railroad commissioners can arbitrarily determine in advance what shall constitute ordinary care or reasonable prudence in a railroad company, at a crossing in every particular case which may afterwards arise * * *; each case must stand upon its own merits and be decided upon its own facts and circumstances."

*Headlights, bells, and whistles.* The brakeman Gullard, cor-

roborated by the engineer Lohman and the fireman Tempfel, testified that as the engine approached and passed over the crossing the bell was rung but the whistle was not blown. Lohman testified that as the train proceeded to and over the crossing the engine headlight and the two blizzard lights, one on either side of the front of the engine, were burning. Plaintiff and her mother testified that they saw no lights on the engine and that they heard no ringing of a bell or sound of a whistle as they approached the crossing although they could have heard such signals had they been given. We think there is sufficient testimony in the record to show that plaintiff and her mother were in a position to have heard these signals if they had been given. One window of the car was open and signals could be heard on the highway for a mile or more from the crossing. This condition of the record also was a jury question in a case where negative testimony is relied upon to make out prima facie case. In Walsh v. Butte, Anaconda etc. Ry. Co., 109 Mont. 456, 465, 97 Pac. (2d) 325, we held that the negative testimony of a guest riding in an automobile that he heard neither whistle blown nor bell rung, was sufficient to make out a prima facie case that neither warning was given. See also Riley v. Northern Pac. R. Co., 36 Mont. 545, 93 Pac. 948; Walters v. Chicago etc. Ry. Co., 47 Mont. 501, 133 Pac. 357, 46 L. R. A., N. S., 702; Rau v. Northern Pac. R. Co., 87 Mont. 521, 289 Pac. 580.

*Duty of defendants at extra-hazardous crossings.* The duty of railroad companies in operating their cars at extrahazardous crossings is established by many decisions. 52 C. J. 211, section 1810, states the rule as follows: "Where the crossing is especially dangerous it is incumbent on the company to use increased care commensurate with the danger." Citing numerous authorities, including the California case of Young v. Pacific Electric Ry. Co., 208 Cal. 568, 283 Pac. 61.

44 Am. Jur. 747, section 507, states the rule thus: "The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual

precautions, is particularly applicable where the dangerous condition results from obstructions to the view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution commensurate with the situation to avoid collisions with travelers on the highway, as by a less amount of speed, or by increased warnings, or otherwise, or, if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers, such as gates or other safety devices. * * * The question really is as to what is due care where the view of the tracks is obstructed, and it is usually left to the jury to say whether, in view of the obstructions, the company has exercised ordinary care in respect to the peculiarly dangerous condition of the crossing; whether ordinarily prudent men would have taken extra precautions; and whether such precautions were taken in the particular case." Citing Green v. Southern Pac. Co., 53 Cal. App. 194, 199 Pac. 1059.

60 A. L. R. at page 1106 states the rule as follows, accompanied by a large number of supporting authorities, including Shaber v. St. Paul, M. & M. R. Co., 28 Minn. 103, 9 N. W. 575; Russell v. Oregon R. & Nav. Co., 54 Or. 128, 102 Pac. 619, and many others: "Where the evidence shows that a railroad crossing is for any reason peculiarly dangerous, it is a question for the jury whether the degree of care which a railroad company is required to exercise to avoid accidents at crossings imposes on the company the duty to provide safety devices at that crossing."

At page 1113 of the same treatise, the law is stated as follows: "Evidence that a traveler's view of approaching trains is obstructed may warrant a finding that the railroad was negligent in failing to maintain gates or other safety devices at the particular crossing." Citing numerous authorities, including the California case of Marchetti v. Southern Pac. Co., 204 Cal. 678, 269 Pac. 529.

In Barnum v. Grand Trunk Western R. Co., 148 Mich. 370,

111 N. W. 1036, 1038, the court said: "It is quite possible that no one of these facts by itself would constitute, or even evidence, negligence, and yet when all are taken together a jury be fully justified in finding negligence."

*Negligence of driver as proximate cause of collision.* Defendants urge that the sole approximate cause of plaintiff's injuries was the negligence of Mrs. McFarren, the driver of the auto. It is well settled that the negligence, if any, of the driver of a vehicle is not to be imputed to a passenger. Plaintiff in this case was a guest and the only burden upon her was to take such precautions for her own safety as under the particular circumstances were reasonable. In Grant v. Chicago etc. R. Co., 78 Mont. 97, 112, 252 Pac. 382, 385, we said: "* * * the default of * * * the driver, in disobeying the provisions contained in section 3842, Revised Codes of 1921, requiring certain specified acts of all persons 'driving' motor vehicles upon the public highways in this state, outside of corporate limits of incorporated cities or towns, cannot, by imputation, be made the default of plaintiff, the passenger." To the same effect is Laird v. Berthelote, 63 Mont. 122, 206 Pac. 445. "As a general rule the negligence of the driver of a vehicle approaching a railroad crossing in failing to look and listen for approaching trains, cannot be imputed to the occupant of a vehicle who is without personal fault." 52 C. J., Railroads, sec. 1891, p. 315; Funderburk v. Powell, 181 S. C. 412, 187 S. E. 742. Defendants contend that Mrs. McFarren could have seen the gondola at the crossing if her lights were good, as she testified, and that she was negligent in failing to observe the train on the crossing in time to stop; also in failing to stop as required by section 3842, Revised Codes of Montana, 1935. As to whether in the exercise of ordinary diligence she saw or should have seen the train on the crossing was a question for the jury and the aggregate conditions affecting the visibility of said crossing have been heretofore reviewed.

Defendants urge that under section 3842, Revised Codes, it was the duty of Mrs. McFarren to bring her automo-

bile to a full stop not less than ten nor more than 100 feet from the intersection of the crossing and the public highway, on the ground that the view was "obscure" and because a moving train was then within sight or hearing. The word "obscure" means not clear, full or distinct. As applied to a law requiring an adequate signaling device to be sounded at intersecting highways where the operator's view is *obscured,* a view is "obscured" when it was not clear and distinct. Carlson v. Meusberger, 200 Iowa 65, 204 N. W. 432. There is evidence in this case heretofore reviewed, which might warrant the conclusion that the Dennis Beet Dump Crossing, far from being merely "obscured," was actually invisible at the time of the accident. It surely cannot be the purpose of section 3842 to impose upon the driver of the car the duty to stop from 10 to 100 feet distant from a railroad grade crossing with the location of which he is not familiar and which he cannot, by reason of peculiar or unusual conditions, see. Moreover, section 3842 imposes on the driver of a car the duty to stop, look and listen "when a moving train is within sight or hearing * * * to warn the traveling public of approaching trains or cars." This section as its language indicates does not apply to trains which are not approaching a crossing but are actually occupying it, presumably because a person who sees a train actually on a crossing would seem to require no prohibition against driving ahead and into it.

We think that Mrs. McFarren's duty was to avoid running into the train if she saw it or in the exercise of reasonable diligence should have seen it and that compliance with the provisions cf section 3842 was not required of her in the case of a train occupying or moving slowly over a crossing.

Defendants next contended that Mrs. McFarren was negligent as a matter of law because she could not stop within the distance illuminated by her headlights. The rule invoked is by no means universally approved by the courts. See annotation in 58 A. L. R. beginning at page 1493. One of the cases reported in said volume of A. L. R. is Tresise v. Ashdown, 118 Ohio St.

307, 160 N. E. 898, 58 A. L. R. 1476. It was held that an instruction that the operation of a motor vehicle at such a rate of speed that the driver could not stop within the distance at which an obstruction in the highway could be seen by his own headlights constituted negligence per se was erroneous; that each case must be considered by the jury in the light of its facts and circumstances and the usual tests applied to determine whether there was a failure to exercise ordinary care in the operation of such motor vehicle. See also Morehouse v. City of Everett, 141 Wash. 399, 252 Pac. 157, 58 A. L. R. 1482; Moyer v. Vaughan's Seed Store, 242 Ill. App. 308; Burgesser v. Bullock's, 190 Cal. 673, 214 Pac. 649; Millspaugh v. Alert Transfer & Storage Co., 145 Wash. 111, 259 Pac. 22.

Anderson on Automobile Accident Suits, page 1291, section 1055, states the law as follows: "It is error to instruct the jury that operation of an automobile in such manner that it could not be stopped in the range of its lights is negligence per se." Citing Tresise v. Ashdown, supra, and Hickerson v. Jossey, 131 Or. 612, 282 Pac. 768, 283 Pac. 1119. Defendants assert that this court has approved the rule for which they contend in the Jarvella case, 101 Mont. 102, 53 Pac. (2d) 446, 450, in which we said: "It is contended that plaintiffs were guilty of contributory negligence under the rule approved in the case of Knott v. Pepper, 74 Mont. 236, 239 Pac. 1037, 1039 * * *." Knott v. Pepper involved a collision after dark between plaintiff's automobile, the lights of which were burning and that of defendant which was being driven *without lights*. That state of facts is not applicable to the case at bar and we do not consider the Jarvella case or the Knott case as blanket endorsements of the rule that it is negligence under all conditions and all circumstances for the driver of a motor vehicle on a public highway to operate same in such manner that it cannot be stopped within the range of its lights. In the Jarvella case we merely held that on the *facts presented* the question of contributory negligence, if any, was for the jury.

*Contributory negligence of plaintiff.* Defendants assert that

plaintiff was guilty of contributory negligence. As we have heretofore noted, plaintiff was a guest of the driver of the car and her only duty was to take such precautions for her own safety as under the particular circumstances were required. Defendants rely on Sherris v. Northern Pac. R. Co., 55 Mont. 189, 175 Pac. 269. In that case plaintiff, a guest, was being driven in an automobile across the railroad yards in Missoula and was shown by the evidence to have been fully aware of the danger in approaching a crossing, to have had the same opportunity to notice the approach of the train as did the driver, and finally to have relied upon his own efforts to protect himself. It was held that the jury could have found plaintiff contributorily negligent in so doing. The facts of the Sherris case are obviously unlike those in the case at bar. In the instant case, if Mrs. Mc-Farren, the driver of the car, "looking straight ahead" did not see the train at the crossing by reason of the obstructions to vision reviewed herein, certainly the plaintiff cannot be held guilty of contributory negligence in likewise failing to see the train, nor can it be said that she was guilty of any disregard for her own safety. Mrs. Broberg testified that she does not drive a car herself; that she was not familiar with the crossing and did not see the train at the crossing before the auto hit it. Neither did she see any lights on the locomotive or hear the ringing of a bell or the sound of a whistle as they approached the crossing, although she stated that she would have heard the bell or whistle had they been rung or blown.

We have examined the cases cited at page 47 of defendants' brief and all of them involve facts which distinguish them from the case at bar. We cannot say on the record before us that plaintiff was guilty of contributory negligence.

*Instructions.* Specifications of error Nos. 4 and 5 assign error of the trial court in refusing to give defendants' requested instructions Nos. 7 and 7A. Instruction No. 7, if given, would have amounted to a peremptory instruction to the jury to find a verdict for the defendants, since if the jury had fol-

lowed it, they must of necessity have found that the proximate and sole cause of plaintiff's injury was the negligence of Mrs. McFarren, thereby conflicting with the theory on which the case was submitted to the jury. Furthermore, the offered instruction No. 7 would have entirely prevented consideration of substantial evidence as to the opportunity for sight and hearing at the scene of the collision and of whether or not in the exercise of reasonable care, Mrs. McFarren should have seen the gondola in time to avoid collision with it. Offered instruction No. 7A was an abstract statement of the law and open to the same objection as offered instruction No. 7. Moreover, it assumed as a matter of law that Mrs. McFarren should have seen the gondola in time to stop and avoid a collision in the face of substantial evidence to the contrary.

Assignment No. 6 relates to the refusal of defendants' offered instruction No. 8: This instruction is open to objection on several grounds, the first of which is that it completely ignores the question of the visibility of "objects ahead in the highway" and amounts in effect to a peremptory instruction to the jury to find in favor of the defendants.

*Assignment No. 7 relating to defendants' offered instruction No. 14.* We find no error in the refusal of this instruction. It is inapplicable in a case like this where there are conditions which seriously affect the ability of a person to "see by looking."

*Assignments Nos. 8 and 9.* We think no prejudicial error to the rights of defendants resulted from the refusal of their offered instruction No. 5 and the giving of same as modified by the court in its instruction No. 13. The instruction as given by the court was more favorable than unfavorable to defendants.

*Assignment No. 10.* In our opinion instruction No. 16 given by the court was a correct statement of the law regarding the duty of the driver of an automobile, in this case, when placed in a position of sudden peril. We do not see how said instruction could have been prejudicial to the rights of defendants.

*Assignment No. 11*—Court's instruction No. 10. We find no error in the giving of this instruction.

*Assignment No. 12 relating to defendants' offered instruction* ▉▉▉ *No. 6.* This instruction was properly refused in view of the evidence as to the extrahazardous character of the crossing. It was also an invasion of the rights of the jury.

*Assignments 13 and 14 relating to defendants' offered instruction* ▉▉▉ *struction No. 12.* The court gave instruction No. 12A which covered the objections to defendants' offered instruction No. 12.

*Assignment No. 15.* Assuming that the trial court's ruling excluding the testimony of Dr. MacDonald was error, we think it did not amount to such error as to require a reversal of the judgment in this action.

*Assignment No. 16.* We think no reversible error can be predicated on the admission of photographs, plaintiff's exhibits 1, 2 and 3, either because they are "blurry" or because they do not portray the immediate scene at the time of the accident.

*Assignments Nos. 17, 18 and 19.* We find no reversible error in these assignments relating to the admissibility of evidence.

*Specification No. 20*—Re-taxing costs. Defendants moved to ▉▉▉ re-tax four items of plaintiff's cost bill. The court sustained the motions as to item 4 and in part as to item 2 but denied the motion as to items 1 and 3. Item 1 was a charge of $15 for fees of plaintiff's witness Folkerts and is shown in the cost bill under the item 'Witness fees Mr. Folkerts five days $15.' Defendants' motion to re-tax and their brief state that "the witness was present and testified on only one day and was thereafter excused." Plaintiff's brief states (which is a fact) that "There is nothing in the record to show that these witnesses were not actually in attendance to be used if the occasion required" and that the memorandum of costs was not impeached. Likewise the ruling of the trial judge on the motion to re-tax does not indicate on what ground it is based nor whether the

witnesses in question were present during the number of days for which they were allowed witness fees. Under this condition of the record we cannot say whether the item of witness fees was properly allowed and we must therefore sustain the ruling of the trial judge as to item 1 and, for the same reason, as to item 2.

Item 3 is a charge of $25 for photographs which were introduced as exhibits on the trial of the case. In Montana Ore Purchasing Co. v. Boston etc. Min. Co., 33 Mont. 400, 84 Pac. 706, this court said that it has always observed the rule that no item of disbursement may be recovered by the successful party which does not come within the statute. Sec. 9802 Rev. Codes of Montana 1935. The statute does not include the cost of photographs as proper costs and disbursements unless they may be said to be included in the words "and such other reasonable and necessary expenses as are taxable according to the course and practice of the court." It is our opinion that the photographs in question were not "necessary expenses" such as are contemplated by the above statute and that defendants' motion to strike item 3 should have been sustained.

Except for the modification of plaintiff's cost bill above indicated, the judgment is affirmed.

Mr. Justice Angstman and Mr. Justice Metcalf concur.

Mr. Chief Justice Adair dissents.

Mr. Justice Cheadle (dissenting).

Any further discussion of the evidence would uselessly prolong this decision. Suffice it to say that from a study of the record, I am convinced that the majority are in error in not holding that, (1) the defendants were not negligent and, (2) the negligence of the driver of the automobile involved was the sole proximate cause of plaintiff's injury. In the first place it was not shown that the crossing in question was unusually hazardous, which it must have been to permit recovery. This crossing is an ordinary country crossing, and no peculiar and unusual facts and circumstances or peculiar environment have been shown to exist

to bring the case within the holding in the Jarvella case, supra. There is evidence that the road surface was dark in color, and for that reason tended to absorb the lights ahead of the automobile. But if such circumstance is to constitute this crossing unusually hazardous, then every railroad crossing of an oiled highway in Montana is likewise unusually hazardous. The facts and circumstances of the two cases are dissimilar; additionally, the Jarvella decision was based, at least in part, upon the practice of the railway company in maintaining a watchman at the crossing during a part of the day, this constituting, according to the court, a recognition by the company that the crossing was extraordinarily dangerous.

The rule is that a train standing on or moving over a crossing is effective and adequate warning in itself without warning signals. If the driver of the automobile here involved told the truth about the condition of the headlights, there is no escape from the conclusion that she was negligent. In spite of her testimony that the lights were standard and in good condition, as to the collision she stated, ''The first thing I noted, the car was right in my face and of course I put my brakes on.'' It is obvious that the driver failed in her duty to exercise her intelligence to discover and avoid dangers that may have threatened her. Incret v. Chicago, M., St. P. & P. R. Co., 107 Mont. 394, 86 Pac. (2d) 12.

I might have taken a different view had the train been approaching, rather than on, the crossing as the automobile approached it. But under the facts presented the collision was caused by the driver's negligence. Since I think that the crossing was not shown to be unusually hazardous, the defendants were not guilty of negligence in any respect; consequently I believe that the motions for nonsuit and directed verdict should have been granted, and that the judgment should now be reversed.