Helen I. WRZESINSKI, Administratrix of the Estate of Walter L. Wrzesinski, Deceased, Plaintiff,

v.

CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPA-NY, a Wisconsin corporation, Defendant.

Karen J. BERG, Ellen L. Berg, and Larry J. Berg, minors, by Joyce M. Berg, their Guardian ad Litem, and Joyce M. Berg, individually, Plaintiffs,

v.

CHICAGO, MILWAUKEE, ST. PAUL and PACIFIC RAILROAD COMPANY, a Wisconsin corporation, Defendant.

Civ. Nos. 334, 336.

United States District Court
D. Montana,
Billings Division.

July 26, 1962.

461

C. J. Schile, Ryegate, Mont., and Robert J. Holland and D. L. Holland, Butte, Mont., for plaintiff.

Garlington, Lohn & Robinson, Missoula, Mont., for defendant.

JAMESON, District Judge.

Walter L. Wrzesinski and Glenn A. Berg were killed instantly on March 5, 1961, when an automobile driven by Berg, in which Wrzesinski was riding, was struck by defendant's passenger train at a crossing in the incorporated town of Ryegate, Montana. Cause No. 334 was instituted by the administratrix of the estate of Walter L. Wrzesinski, deceased, to recover damages sustained by his widow and minor child. Cause No. 336 was instituted by the widow and minor children of Glenn A. Berg. The two causes were consolidated for trial before the court without a jury.

The tracks of the defendant railroad extend in a generally easterly and westerly direction through the town of Ryegate. The tracks are intersected by First Street, which runs north and south. The main highway is parallel with the tracks, and at First Street is approximately 110 feet north of the north track. The main part of Ryegate is north of the highway. There are three sets of tracks and a plank crossing approximately 28 feet wide extending from a line a short distance north of the north rail of the north track to a line a short distance south of the south rail of the south track. The tracks are four feet eight and one-half inches between rails and the distance between the tracks, ten feet.

On either side of the tracks are Griswold automatic signals, consisting of duplex flashing red lights, a rotary stop disk, and the familiar cross buck signs. These signals will be described in more detail later herein. At the time of the collision, one of the red lenses on the signal south of the track was broken, so that this portion of the signal flashed white instead of red.[1]

There is a grain elevator a few feet south of the south track, the east side of which is 82 feet 6 inches from the center of First Street. At the time of the collision there were box cars on the south track in front of the elevator. The east end of the easterly car was 78 feet 6 inches from the center of First Street.

The train was proceeding easterly on the north (main) track at a speed of approximately 70 miles an hour. The automobile in which decedents were riding approached the crossing on an unimproved farm road from the southeast which turns into First Street approximately 30 feet south of the south track. South of the crossing, First Street itself is graveled and runs due south. The traveled roadway is 24 feet wide with a grade spread to a total width of 28 feet. The main traveled road turns toward the southwest approximately 50 feet south of the south track.

The accident occurred about 2:25 P.M. on a clear day with the sun shining. The train was running seven or eight minutes late.

The Wrzesinski and Berg homes are located some distance southeast of the crossing and the road on which decedents were traveling extends to those homes. Both Wrzesinski and Berg were familiar with the crossing and had used it regularly in traveling from their homes to the main part of Ryegate. Just before entering First Street, this road runs westerly at a slight angle toward the north. A vehicle approaching the crossing on this road makes a rather

1. It was stipulated that the defendant's signal maintainer and agent knew three days before the date of the collision that the lens was broken and that the train crew was not notified of the broken lens.

sharp turn (but less than a right angle) to the right (north) a few feet south of the south Griswold signal.

Numerous photographs were received in evidence. In one series, a man was standing on or near the northern-most track at various distances west of the point of impact. With the camera placed 50 feet south of the north track, the man was visible at a distance of 175 feet; with the camera placed 36 feet south of the north track, at a distance of 255 feet; and with the camera placed 29 feet 6 inches south of the north track, at a distance of 425 feet. A train approaching from the west would become visible at approximately the same distances.[2]

By agreement of counsel, the court visited the scene of the collision. I was there twice when the same passenger train passed through Ryegate. On one occasion, defendant's signal maintainer and agent, in the presence of one of plaintiffs' counsel, operated the signal device for an additional period of time.

Plaintiffs contend (1) that the crossing was extrahazardous; (2) that the signal was inadequate to give warning to vehicles approaching on the road on which decedents were traveling in that (a) the signal post on the south side of the tracks does not face a car coming from the southeast but rather faces in a southwesterly direction, and (b) that the bell on the signal is grossly inadequate in that "it is so difficult to hear as to make the same useless"; (3) that the train was traveling at an unreasonable rate of speed considering the conditions of the crossing; (4) that the broken lens made the signal more inadequate and defendant was negligent in failing to repair the lens and failing to notify the train crew of the broken lens; (5) that under the circumstances defendant was negligent in failing to station flagmen at the crossing.

Defendant denies the acts of negligence alleged by plaintiffs and contends (1) that the crossing was adequately protected by the Griswold automatic flashing light signals; (2) that the train crew sounded the warning bell and whistle as required by law;[3] (3) that decedents violated Section 32–2191, R.C.M. 1947,[4] by failing to stop not less than 15 feet from the track on which the train was traveling; and (4) that the train was in full view of the decedents

2. There was no direct proof with respect to the position of the camera lens in relation to that of an occupant of an approaching automobile. The engineer and the fireman of defendant's train both estimated that they could see the decedents' car for about two seconds before the train reached the crossing, or for a distance of about 200 feet. The view of an occupant of the car would have been approximately the same.

3. Section 72–219, R.C.M. 1947, provides in part: "If any railroad corporation within this state * * * shall permit any locomotive to approach any highway, road, or railroad crossing, without causing the whistle to be sounded at a point between fifty and eighty rods from the crossing, and the bell to be rung from said point until the crossing is reached * * * shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined * * *."

4. That statute provides in part:
"(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
"1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
"2. A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
"3. A railroad train approaching within approximately one thousand five hundred (1,500) feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
"4. An approaching railroad train is plainly visible and is in hazardous proximity to such crossing."

while they were in a position of safety and they were guilty of contributory negligence in driving in front of the train.

At the outset, "(I)t must be kept in mind that railway trains have the right of way over their own railway lines and may run their trains at will, being responsible for due care to protect the lives and property of others." Incret v. Chicago, Milwaukee, St. Paul & Pacific Railroad Company, 1938, 107 Mont. 394, 441, 86 P.2d 12, 16. On the other hand, the Montana court in a prior case also recognized the rule that a railroad company has no "paramount right to the use of [the] crossing".[5] Did the defendant exercise due care to protect the lives of the occupants of the Berg automobile, i. e., care commensurate with the conditions existing at the crossing where the fatal accident occurred?

There is little dispute in the facts, except for a sharp conflict in the evidence as to whether the train crew sounded the whistle as the train approached the crossing. Harold Fox testified that, from his home one block west and one and one-half blocks north of the crossing, he heard the train rumbling toward the crossing and heard the sound of the collision, but did not hear the whistle. Byron Corcoran, a relative of both Mrs. Wrzesinski and Mrs. Berg, was seated in the Ryegate Bar on the corner across the highway north of the crossing. Wayne Carpenter was tending bar. Both testified that they heard the noise of the collision, but did not hear the whistle blown prior to the collision. Mrs. Anna Dolve, the acting postmaster in Ryegate and wife of the county sheriff, testified that she was in her home two and one-half blocks west of the crossing, north of the highway, and was talking on the telephone to her husband when she heard the crash. She usually heard the train whistle but did not hear any whistle the day of the accident. She could not say positively, however, that the train did not whistle. Mr. and Mrs. William Esp and their nephew David Storfer were riding in a car driven by Esp on the highway parallel to the train. They kept abreast of the train for about two miles until they slowed and turned off the highway, to their left and away from the train, at a point in the town of Ryegate three blocks west of the crossing. All testified that they could hear the train but did not hear the whistle at any time.

On the other hand, Harry Schultz, the engineer, and William Virig, the fireman, both testified positively that the whistle was sounded and the bell rung.[6] Their testimony was corroborated by three disinterested witnesses. Glen T. Knopp heard the whistle from a service station on the north side of the highway 300 feet west of the crossing. He looked up and saw the train. He heard the whistle sounded again as the train approached the crossing, and then heard the collision, which sounded like an "explosion". Mrs. Maxine Dunn, who was sewing in the front room of her home two and one-half blocks west of the crossing and north of the highway, heard the train whistle, glanced at the clock, and noticed the time was about 2:30. Mrs. Earl Bracha and her husband were papering a room in their home across the street from the Dunn home. Mrs. Bracha testified that she heard the whistle and saw the train go by.

The testimony of those witnesses who did not hear the whistle blown, while so-called negative in character, is sufficient to raise an issue of fact as to whether the signals were given as required by

---

5. Walters v. Chicago, Milwaukee & Puget Sound Ry. Co., 1913, 47 Mont. 501, 506, 133 P. 357, 358, 46 L.R.A.,N.S., 702.

6. Their detailed testimony, if accepted as true, shows compliance with Section 72-219, R.C.M.1947, supra. While their testimony is attacked as "interested", the fact that they are employees of defendant is not enough to render their testimony unbelievable, particularly where, as here, it is substantially corroborated by disinterested witnesses. Sullivan v. Northern Pacific Ry. Co., 1939, 109 Mont. 93, 107, 94 P.2d 651.

law.[7] The testimony of the train crew that the whistle signal was given, however, is convincingly corroborated by three disinterested witnesses who heard and identified the train whistle while engaged in normal tasks in natural everyday situations. I find from a preponderance of the evidence that the required signals were given.

■ It is plaintiffs' first contention that the crossing was extrahazardous. As a general rule in Montana, the question of whether a crossing is ordinary or extrahazardous is one of fact. The test is whether there are present for determination "any peculiar or unusual facts and circumstances or any peculiar environment rendering the situation unusually hazardous". Broberg v. Northern Pacific Ry. Co., 1947, 120 Mont. 280, 290, 182 P.2d 851, 856. The rules applicable to extrahazardous crossings are well summarized in the Broberg case as follows:

"(T)he railroad company must use care commensurate with the conditions existing. 'Where the crossing is especially dangerous it is incumbent on the company to use increased care commensurate with the danger, even though the crossing is not a much travelled and used one.' 52 C.J. 211, sec. 1810." (120 Mont. at 294, 182 P.2d at 859.)

* * *

"44 Am.Jur. 747, section 507, states the rule thus: 'The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions, is particularly applicable where the dangerous condition results from obstructions to the view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution comensurate with the situation to avoid collisions with travelers on the highway, as by a less amount of speed, *or by increased warnings, or otherwise, or, if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers, such as gates or other safety devices.* * * * The question really is as to what is due care where the view of the tracks is obstructed, and it is usually left to the jury to say whether, in view of the obstructions, the company has exercised ordinary care in respect to the peculiarly dangerous condition of the crossing; whether ordinarily prudent men would have taken extra precautions; and whether such precautions were taken in the particular case.' Citing Green v. Southern Pac. Co., 53 Cal.App. 194, 199 P. 1059." (Emphasis added.) (120 Mont. at 295, 296, 182 P.2d at 859.)[8]

The cases from Montana, as well as those from other jursdictions I have examined, are in agreement with Broberg with respect to the duty of a railroad company at an extrahazardous crossing. Increased warnings must be given when reasonably necessary to warn travelers using the crossing of the approach or presence of the train, through the use of automatic signaling devices, flagmen, crossing gates or some other

---

7. Walters v. Chicago, Milwaukee & Puget Sound Ry. Co., supra; Walsh v. Butte, Anaconda & Pacific Ry. Co., 1939, 109 Mont. 456, 465, 97 P.2d 325.

8. The rule in Broberg was followed in Dimich v. Northern Pacific Ry. Co., 1959, 136 Mont. 485, 348 P.2d 786, rehearing denied 1960. It should be noted, however, that both Broberg and Dimich are factually distinguishable from the instant case. In both the accidents occurred on a dark night when visibility was limited. The road in each case was upgrade and black topped, and the automobile struck a black colored object. In Broberg, warning signs existed, but were obscured. In Dimich, there were no warning signs. Both crossings were seldom used, especially at night time. Under these factual situations the court held in each case that the question of whether the crossing was extrahazardous was properly committed to the jury. (348 P.2d at 790.)

appropriate means. Generally the cases have considered obstructions to vision or hearing sufficient to support a jury finding that a crossing is extrahazardous. No distinction is made between obstacles which hide a train on a crossing or the crossing itself, and those which hide trains approaching a crossing.[9]

As noted supra, there is little dispute with respect to the physical conditions existing at the crossing at the time of the accident. The grain elevator west of the crossing is a large structure and close enough to the crossing to block out the view to the west for a considerable distance of travelers approaching on any of the three roads south of the crossing. The east box car on the track next to the elevator further blocked the view. These obstructions also tend to make sounds from the west less distinct, so as to impair the warning a traveler might otherwise receive from the train whistle and bell. The train normally passes through Ryegate at a high rate of speed and did so on the day in question. By any estimate or measurement, but a few seconds elapsed from the time one approaching from the south could first see the train and the train's arrival at the crossing.[10]

On the other hand, the crossing itself is obvious to all travelers for a considerable distance, and the occupants of the Berg car were thoroughly familiar with the crossing. The car had crossed two other tracks before reaching the main (north) track where the collision occurred. From the time the car turned into First Street South it had traveled approximately 60 feet due north to the point of impact.

The defendant had installed the Griswold automatic signals in 1949.[11] The crucial question for determination is not whether the crossing was in fact extrahazardous, but whether the defendant, through the installation and operation of this signal system, used care commensurate with the conditions and dangers existing at the crossing.

Each signal is mounted on a concrete pedestal. The signal on the south side is approximately 15 feet south of the south track and 6 feet east of First Street (16 feet 3 inches from the center of the street). The signal on the north side is approximately 11 feet 6 inches north of the north track and 6 feet 6 inches west of First Street (16 feet 9 inches from the center of the street). The south signal faces slightly southwest while the signal on the north side of the crossing faces directly north.

When an east bound train reaches a point 2929 feet west of the crosssing, the signals begin to operate. Each signal has an octagonal disk mounted thereon, which contains the word "STOP" in large black letters on a yellow background. When the signals are in operation the disks face the same direction as the signals upon which they are

9. See Ham v. Maine Cent. R. Co., 1922, 121 Me. 171, 116 A. 261; Pangborn v. Central Railroad Co. of New Jersey, 1955, 18 N.J. 84, 112 A.2d 705; Dimich v. Northern Pac. Ry. Co., supra; Broberg v. Northern Pac. Ry. Co., supra; Jarvella v. Northern Pac. Ry. Co., 1935, 101 Mont. 102, 53 P.2d 446; compare Norton v. Great Northern Ry. Co., 1927, 78 Mont. 273, 254 P. 165; and Incret v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., supra.

10. It is impossible to determine accurately the speed of the car. The engineer estimated a speed of 8 to 10 miles an hour, and the fireman a speed of 4 to 6 miles an hour. Nor is there any way to determine whether the car stopped at any point south of the point of impact. At 5 miles an hour the car would travel approximately 7½ feet per second, at 10 miles an hour, 15 feet, and at 15 miles an hour, 22½ feet. Assuming that the car did not stop, when the train was 200 feet from the crossing, the car would be approximately 15 feet from the point of impact if its speed were 5 miles an hour; 30 feet if 10 miles an hour; 45 feet if 15 miles an hour. At 300 feet, the distances would be approximately 22½ feet, 45 feet and 67½ feet, respectively.

11. A representative of the manufacturer of the Griswold signals testified that the signal conformed with standards adopted by the Association of American Railroads and that approximately 4500 signal systems had been sold, including 78 delivered in 1961.

mounted. Flanking each disk and just above it, each signal is equipped with two hooded electric lights with red lenses, which flash alternately when the signal is operating. The flashing signals are 7½ to 8 feet above the ground, and the two lights are 28 to 30 inches apart. Each red lens is 8⅜ inches in diameter, with an inch of glass around the outside of the lens. Topping each signal structure are large "crossbuck" signs with the words "railroad crossing" contained thereon. The signals have bells which sound when the signals operate. The bells are intended to warn pedestrians and may or may not be heard by persons approaching in automobiles. In addition, the rear of each signal is equipped with a duplicate set of the hooded electric lights which face in the opposite direction. Thus the rear lights on the north signal give additional warning to travelers from the south, and those on the south signal perform a similar function for travelers approaching the crossing from the north.

When the signals are not in operation, the lights do not flash and the stop disks are perpendicular to the road so as to be invisible to most travelers. But the unimproved road, used by the automobile in which decedents were riding, approaches the crossing from the east or southeast in a direction almost parallel to the railroad tracks east of the crossing. This road turns into First Street at a point approximately 30 feet south of the most southerly track at the crossing, so that an automobile using that road to approach the crossing would ordinarily pass quite near the south signal at a distance of about 15 feet. Before that signal begins to operate, the rotary stop disk faces toward the road on which decedents were approaching.

As soon as the signal commences to operate, the disk rotates to its position facing slightly toward the southwest. The flashing lights on that signal likewise face toward the southwest, so that both the stop sign and the flashing lights are clearly visible to traffic approaching directly from the south on First Street and to traffic on the main road approaching from the southwest; but they are not so readily observable by traffic approaching on the road from the southeast, by reason of the angle and proximity of approaching automobiles to the signal structure.[12]

It is clear from the evidence that the Griswold signals were operating properly at the time of the accident (aside from the fact that one south signal flashed white instead of red). Plaintiffs do not seriously contend otherwise, but they have vigorously attacked the adequacy of the south signal to warn travelers approaching from the southeast.[13] In doing so, however, no mention has been made of the protection afforded by the alternately flashing pair of lights mounted on the rear of the north signal. That signal is clearly visible to all vehicles crossing the tracks from the south. When an automobile turns past the south signal and on to First Street, the lights of the north signal come into view directly ahead of the car and at sufficient distance to make an easy angle of sight. The meaning of the alternately flashing red lights is apparent to anyone approaching the crossing and by reason of its location near the main line (north) track it is readily observable. Even though the stop disk and crossbuck sign of the north signal face in the opposite direction, the flashing red lights have an unmistakable meaning and convey an adequate warning.

12. It seems probable also that the position of the sun at the time of the accident would make this signal less clearly observable to the occupants of the Berg car.

13. There was evidence that a prior agent of the defendant, during a three-year period she was employed at Ryegate, made a practice on her own initiative, of flagging north bound traffic when east bound trains passed over this crossing, but only during the days she worked and while she was on duty. There was evidence also that there had been no prior accidents at the crossing during the 12 years the Griswold system had been in operation.

That the signal would have been operating when decedents' car made the turn onto First Street and approached the crossing is demonstrated by the evidence. The train activated the signal 2929 feet west of the crossing and, traveling at 70 miles per hour, it reached the crossing slightly less than 28 seconds later. Even at three miles per hour the car would have been approximately 125.5 feet from the point of the collision when the signal began to operate. Accordingly, at any speed, these flashing red lights were clearly visible to the occupants of the Berg car for the 60 feet they traveled due north after turning into First Street. If the car stopped at any point within that distance, the signals were flashing when the car started to move forward.[14]

The question of a reasonable train speed at a crossing is directly related to the nature of the warning there afforded to travelers. Traveling at a high rate of speed does not constitute negligence as a matter of law at crossings equipped with sufficient warning devices. In Engberg v. Great Northern Ry. Co., 1940, 207 Minn. 194, 290 N.W. 579, 154 A.L.R. 206, for example, it was held that a train speed of 50 miles per hour was not negligence at an unobstructed crossing equipped with Griswold signals substantially like those involved in this case. See also Forde v. Northern Pacific Ry. Co., 1954, 241 Minn. 246, 63 N.W.2d 11, where a municipal speed ordinance was held to be unreasonable and invalid at an unobstructed crossing also equipped with Griswold signals.[15]

A comprehensive annotation at 154 A.L.R. 112 discusses the question of whether the speed of a train at various types of highway crossings, including crossings with automatic electric signaling devices (p. 236), constitutes negligence. While there is some conflict in the authorities, it is clear that the majority of the cases turn upon whether the particular rate of speed was unreasonable in view of all the surrounding circumstances, including the characteristics of the crossing and the warning devices provided.[16] All that is required is that the speed of the train bear a reasonable relationship to the warning given to the public, so that travelers using the crossing may receive a reasonable warning of the approach of the train to enable

---

14. Baltimore & O. R. Co. v. Green, 4 Cir. 1943, 136 F.2d 88, cited by plaintiffs, is factually similar to the instant case, except for the signal device. In that case there were no warning signals other than the crossing sign, although the city ordinance required signals with flashing lights and a ringing bell. The court held that the jury could properly find that the absence of such signals was not a mere condition attending the collision, but the proximate cause thereof. The court suggested that if the flashing signals had been operating, it was hardly probable "Dr. Graham would have driven in front of the approaching train".

15. In Monforton v. Northern Pacific Ry. Co., 1960, 138 Mont. 191, 355 P.2d 501, the Supreme Court of Montana considered the effect of a train's speed in a case where the plaintiff was held guilty of contributory negligence as a matter of law. Plaintiff there contended that the collision was proximately caused by defendant's negligence in running a fast moving passenger train over a line customarily used for slow-moving freight. The court upheld an instruction that plaintiff "was not entitled to assume that the defendants would operate their trains at any particular time or speed", and held objectionable an instruction to the effect that the jury might take into consideration the fact that the defendant, contrary to established use, caused a fast-moving passenger train to be run upon and over the crossing where plaintiff's vehicle was struck by the train.

16. The annotation reads in part: "The recent trend of decisions * * * is to the effect that speed does not constitute negligence in the absence of a statute or ordinance limiting speed, where adequate warnings of the approach of trains are given to persons using the highways, or where suitable protective measures have been resorted to, and that speed is only material where adequate warnings are not given or such protection is not afforded." (154 A.L.R. at 213.)

them to take proper care for their own safety.[17]

For a train traveling 70 miles an hour, the Griswold signal system in the instant case enlarged the period of warning to travelers using the crossing from the few seconds they might see an approaching train to almost 28 seconds, which seems ample time for a traveler to heed the approach of the train and bring his vehicle under control in a place of safety. When the train activates the signal it is still over one-half mile from the crossing. During the intervening 28 seconds the signals flash continuously. Surely this is a reasonable warning that a train is approaching, a warning that should be equally as effective as a larger area of visibility.

Moreover, under these circumstances, it cannot be said that plaintiffs have shown by a preponderance of the evidence that the train's speed was a proximate cause of the collision. With the time required for the slow-moving car to cross the track (a distance of some 15 feet in clearing the track itself) a collision might well have resulted even if the train had been traveling at an appreciably lesser speed. To say that a collision would have been avoided at a lesser speed would be mere speculation and conjecture. No speed limit was prescribed by statute or municipal ordinance. The speed here was clearly a condition of the occurrence and not a proximate cause of the collision.[18]

 It is my conclusion that the defendant had fulfilled its duty to give adequate warning to the public of the approach of its trains under the circumstances existing at the Ryegate crossing on the day of the unfortunate accident, and that the accident was not proximately caused by any negligence of the defendant. It is unnecessary, accordingly,

to consider whether the decedents were guilty of contributory negligence.

Pursuant to Rule 11(b) of the Local Rules of Court, defendant will prepare, serve and lodge form of judgment.

---

17. See Chicago & N. W. Ry. Co. v. Netolicky, 8 Cir. 1895, 67 F. 665; Lapsley v. Union Pacific R. Co., Cir.Ct., N.D. Iowa 1891, 50 F. 172, 175, aff. 8 Cir., 51 F. 174.

18. See Whiffin v. Union Pac. R. Co., 1939, 60 Idaho 141, 89 P.2d 540, 547, where

the court also distinguished a situation of this nature from those cases where the train is traveling in excess of a speed prescribed by law and a traveler, aware of the approach of the train, relies upon its traveling at the legal speed.